## DUNBAR BROS. CO. v. CONSOLIDATED IRON–STEEL MFG. CO.

Circuit Court of Appeals, Second Circuit.
January 9, 1928.

No. 109.

1. Courts ⟨⟩406(1¼)—Findings supported by evidence are binding on reviewing court.

Findings of trial court are binding on Circuit Court of Appeals, where there is evidence to support them.

2. Sales ⟨⟩441(2)—Manufacturer of springs for locks held, under evidence, not liable under express warranty of suitableness . (Uniform Sales Act Conn. § 12).

Manufacturer of springs to be used in manufacture of locks *held* not liable under express warranty, within Uniform Sales Act Conn. § 12 (Gen. St. Conn. 1918, § 4678), that they would be suitable for buyer's purposes in manufacture of such locks, where evidence showed that it was merely attempting to help lock manufacturer solve problem of preventing broken springs.

3. Sales ⟨⟩262—There must be justifiable reliance on seller's statement to form basis for warranty.

There must be justifiable reliance on seller's statement to form basis for warranty that product will be suitable for purposes for which it is sold.

4. Sales ⟨⟩270—Seller of springs for use in locks held not liable on implied warranty of suitability of springs to withstand breakage, where buyer could examine (Uniform Sales Act Conn. § 16; Gen. Code Ohio, § 8396).

Seller of springs for use in manufacture of locks *held* not liable under implied warranty of suitability of springs to withstand breakage while used in buyer's locks, under Uniform Sales Act Conn. § 16 (Gen. St. Conn. 1918, § 4682), and Gen. Code Ohio, § 8396, defining implied warrants, where seller's statements were made in attempt to co-operate in solving problem of buyer in securing an unbreakable spring in manufacturing its product, and buyer had opportunity for reasonable examination.

5. Sales ⟨⟩272, 273(1)—Implied "warrant of merchantability" is warranty of fitness for general purposes, while implied "warranty of fitness" is warranty that goods suit buyer's special purpose.

Seller's implied "warrant of merchantability" of product is warranty that goods are reasonably fit for general purposes for which they are sold, while implied "warranty of fitness" is warranty that goods are suitable for special purpose of buyer, which will not be satisfied by mere fitness for general purposes.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Warrant; Warranty.]

6. Sales ⟨⟩270—Buyer, having opportunity to examine samples, cannot rely on implied warranty by seller to protect it from defects not discovered (Uniform Sales Act Conn. § 16, subd. [c]).

Where buyer of springs for use in manufacturing locks had opportunity for reasonable examination of samples, it should have discovered any defects, latent or otherwise, and cannot rely on implied warranty under Uniform Sales Act Conn. § 16 (Gen. St. Conn. 1918, § 4682) subd. [c].

In Error to the District Court of the United States for the District of Connecticut.

Action by the Consolidated Iron-Steel Manufacturing Company against the Dunbar Brothers Company for breach of contract. Judgment for plaintiff. Defendant brings error. Reversed.

Epaphroditus .Peck, of Bristol, Conn., and Robinson, Robinson & Cole, of Hartford, Conn., for plaintiff in error.

Hardin & Hess, of New York City (Ernest Angell, of New York City, and Earl Mathewson, of Norwich, Conn., of counsel), for defendant in error.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge. The parties will be referred to herein as below. This action was brought to recover damages for breach of an expressed, and, if not an expressed, an implied, warranty, made in the sale of springs used by the plaintiff in the manufacture of locks. A jury was waived, and after a trial the District Judge made findings of fact, from which he concluded there was a breach of warranty, and he gave judgment for the plaintiff for direct and consequential damages as loss of profits. The warranty claimed is that the springs would be suitable for use in inside door locks made by the plaintiff.

[1] The findings below, having evidence to support them, are binding upon us. David Lupton's Sons v. Automobile Club, 225 U. S. 489, 32 S. Ct. 711, 56 L. Ed. 1177, Ann. Cas.

1914A, 699; Fleischmann Co. v. United States, 270 U. S. 349, 46 S. Ct. 284, 70 L. Ed. 624; Aronstam v. All-Russian Soc. (C. C. A.) 270 F. 460. Such findings are voluminous, but in summary are that the defendant is a Connecticut corporation, engaged as an experienced manufacturer of steel springs. The plaintiff is a manufacturer of locks, among other things, for inside, as well as outside, doors. The particular lock for which the springs purchased were used had a dead bolt and tumbler spring, made and used interchangeably. They were of standard type, and were small and flat, as distinguished from coiled, springs. It was found that, in the spring manufacturing trade, certain experiments or tests were customarily made for purposes of strength and temper, and, "while a buyer may under ordinary circumstances assume, without a test, that a spring in a lock will be satisfactory in the building hardware trade, it is not absolutely certain, without a test. The kind of test given to springs by buyers varies to a considerable degree from plant to plant. By the usage of the trade, manufacturers of springs warrant that they shall not be made of defective material, but, in the absence of express language to the contrary, do not warrant that their design or temper shall be suitable for any particular purpose. From this trade usage, manufacturers of springs rarely depart." It was further found that prior to October, 1923, the plaintiff purchased from the defendant quantities of straight steel tumbler springs used in its inside door locks, and in ordering these springs the plaintiff specified the design desired by submitting, with orders, written instructions, blueprints, or samples. These specifications called for straight springs of given length, width, and thickness. The defendant manufactured such springs from the specifications of the plaintiff, and gave them ordinary commercial temper, for proper design. It was found that the plaintiff received complaints, as to these straight springs, to the effect that they were too hard and broke. When a load was applied to the free end of the spring, the end was deflected, subjecting the spring to certain strain, and causing it to break. There are findings as to the method and result of tempering employed by the defendant, and loss of resiliency of the spring, which are not important, in view of the conclusions we have reached. It is found that prior to November, 1923, while the plaintiff had previously manufactured springs, it had never seen the fixture or lock with which the springs manufactured were

to be used by the plaintiff, and it did not know as to the stresses or strains, or problem involved in giving a straight spring a satisfactory temper for use in the lock of the plaintiff. There is some correspondence between the parties, wherein the plaintiff requested defendant to make an investigation of pieces of tumbler spring and report back to them the result of such investigation. The springs were never sent, but on October 30th the defendant sent a cast iron and steel tumbler, showing how the tumbler springs were used. The defendant made no attempt to determine the stability of the plaintiff's design from its original form of straight springs, but suggested to the plaintiff that it was easy for the plaintiff's workmen to bend the straight spring, in order to insert it in the lock tumbler during the process of assembling, and so, with such bending, the attending strain might be reduced by putting the bend into the spring before it was hardened, and then tempering it while it was in that shape. On November 5, 1923, the defendant wrote the plaintiff:

"* * * We would say at this time that, had we known it was necessary for this spring to be bent in the position in which it is shown in the tumbler, a different process would have been used in completing that spring, because a spring, after being hardened and tempered, will withstand a certain amount of bending without fracturing, but there is a limit to what it will go through. We are putting the tumblers into our manufacturing department, and we know that on the next order, if we are so fortunate as to receive one, the springs will be made in a manner which will take care of this bending operation."

On November 30th the plaintiff forwarded an order for 100,000 of these springs, a second order on February 20th for 100,000, and a third on March 20, 1923, of 150,000. The defendant manufactured 10 samples to be submitted to the plaintiff for inspection and approval. These were manufactured in accordance with the specifications set forth in plaintiff's blueprint of the straight spring. The defendant changed the original design of the flat spring, by inserting a bend in the spring while the spring was in a soft state, and then tempered the spring with a bend in it. On December 15th, the defendant wrote the plaintiff, advising them they were sending two lots of samples, one of which was a "curved spring designed by us, which we find works nicely in the lock mechanism you sent us. This will be a much more suitable spring, as the life is not destroyed by as-

sembling, as is the case with the old style spring." Springs were shipped according to this sample in performance of the contracts for these orders. The plaintiff did not test the samples for determining their durability, but wrote on December 22d that they had tried "the ten new style springs sent us on locks this morning, and the tension is much higher than that of the old style, which we are now using, with the result that the action of the bolt was much better than we have ever had before. The only thing we could find wrong with this new spring was one spring, which we are returning to you marked with red pencil, and which we noted, from the action of the bolt, was much weaker than the other nine springs. However, this might have been an oversight on your part."

The court found that, when the springs were received, they were weighed, counted, and thrown into a general bin. The plaintiff's workmen assembled them into the locks. They would assemble the lock and spring, insert the key, and give it one turn, so that the dead bolt was in a locked position. The lock, with the key inserted, would then be passed to an inspector, who would turn the key back and forth once, and then set the lock aside, with the key inserted and the bolt in a locked position. The locks were then taken to the packing room and given one turn, so as to leave the bolt in an unlocked position, and packed. It thus appears that it was the plaintiff's employees who made the inspection and tests of the springs within the lock.

The court found the springs shipped under these three orders were manufactured from commercially good material, were uniform with regard to dimensions, and were "in commercial compliance with the samples," and "in addition it was found that said springs were commercially uniform with regard to temper," and "the temper itself would probably have been a satisfactory temper for such springs, had they been properly designed." On June 2, 1924, the plaintiff wrote the defendant as to the springs:

"The peculiar thing about the situation is that, even though the springs do not break when they are assembled in the locks, and do not break when our inspectors work the bolt of the lock with the key, and do not even break when our packing room again try the locks, working the spring, after the locks are shipped the springs break, either in the customer's possession, or when the contractors have them in the doors."

The plaintiff argues that liability be im-posed upon the defendant, because there is implied, if not expressed, a warranty that the curved springs would be suitable for use in the plaintiff's lock, and that it was upon such representation that it placed the order and had the springs made as a part of its commercial lock. It is apparent from the findings of the court, which find support in the evidence, that the defendant did no more than make an effort to render assistance, with the plaintiff's fullest co-operation and aid, in solving the plaintiff's problem of securing a spring which would operate satisfactorily in its inside door lock. It did not assume responsibility in case the effort failed. The problem of securing a satisfactory design for the lock and for the spring used therein confronted the plaintiff. It was the lock manufacturer. The plaintiff adopted a specific design for its lock, and used the tumbler spring. The springs were manufactured in accordance with the plaintiff's specifications as given, as found below, with a regular commercial temper for springs of that kind. It is true that the defendant suggested the curve in the spring as an improvement. No custom of business imposed, by rule of law, a liability on the defendant as an insurer against the spring breaking under these circumstances. Such would only follow from an express agreement to be so obligated. While the defendant recommended that the spring be bent before rather than after it was hardened and tempered, this was not such a change of design of the spring, or in the process of preparing for insertion in the lock tumbler, as carried with it a promise of success in operation. Manufacturers should be free to lend advice and assistance to their customers in matters within their general knowledge, gained from their experience, without, in the absence of a promise so to do, guaranteeing the result. Miami Cycle & Mfg. Co. v. National Carbon Co. (C. C. A.) 268 F. 46.

[2] The states of Ohio, where the plaintiff resides, and Connecticut, where the defendant resides and manufactures springs, have adopted a Uniform Sales Act. The plaintiff invokes the aid of the Connecticut statute. Section 12 of the Connecticut Uniform Sales Act (Gen. St. Conn. § 4678) defines an express warranty as an affirmation of fact, or any promise by the seller relating to the goods sold, if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. It is very clear that in the correspondence no promises were made which would form the basis of an

express warranty. While the defendant knew the particular purpose for which the spring was required, both parties were aware of the problem to be solved, and the representations of each, as taken from their correspondence, readily disposes of any claim that the defendant made promise that it could solve the problem suitably for the defendant's need. Plaintiff did not intrust it wholly with the solution of the problem. See Miami Cycle & Mfg. Co. v. National Carbon Co., supra.

When, on November 30, 1923, the plaintiff forwarded its order for springs, its object in writing was to secure "proper springs, that is, with the proper tension," but it also sent specifications, and said that it would like specifications for incorporation of the bend in its blueprints. Of course, this letter, written by the plaintiff, could not form the basis of an express warranty, by virtue of the plaintiff's acquiescence thereto, because acquiescence to this letter would have meant no more than an undertaking on the part of the defendant to see that the springs manufactured in the future would have sufficient tension to throw a dead bolt in the plaintiff's lock, and to furnish plaintiff with specifications describing the bend which was to be put in such springs. The defendant's letters of December 13th and 15th, accompanying the samples, express the minds of the parties, where the defendant said:

" * * * We are to-day sending you samples of springs. we have designed, and which our production department feels will answer your purpose better than those you are now using. Trusting * * * that we have been of material assistance, we remain," etc.

And again:

" * * * We trust you will find the samples we are sending will assist you to get best results, and we will hold the matter open awaiting your report."

[3] It was to this plaintiff reported satisfaction. This was not a positive statement or affirmation of fact, or a promise upon which reliance could be reasonably based. Viewed from the text of these letters and the circumstances under which the letters were written, no reasonable person, in the position of the plaintiff, could rest upon the assumption that it had a firm promise, amounting to a warranty, upon which it might rely, that the spring would be suitable for its purposes in the manufacture of its locks. It must be justifiable reliance to form a basis for a warranty. Williston on Sales (2d Ed.) § 213, p. 413; Rosenbush v. Learned, 242

Mass. 297, 136 N. E. 341. We regard this contract as a sale by sample.

[4, 5] Section 16 of the Sales Act (G. S. Conn. § 4682; G. C. Ohio, § 8396) defines implied warrants in such a contract as (a) that the bulk shall correspond with the sample in quality; (b) that the buyer shall have reasonable opportunity of comparing the bulk with the sample; and (c) that, if the seller is the dealer of goods of that kind, there is an implied warranty that the goods shall be free from any defect rendering them unmerchantable, which would not be apparent on reasonable examination of the sample. The orders filled, as found by the court, were in strict compliance with the sample lot of springs completed in the bent form. The springs shipped were manufactured in accordance with the plaintiff's specifications, except the one improvement of bending the spring. It was tempered as suggested. The bent spring is operated on continuous stresses. A warrant of merchantability is a warranty that the goods are reasonably fit for the general purpose for which they are sold, while a warranty of fitness is a warranty that the goods are suitable for the special purpose of the buyer, which will not be satisfied by mere fitness for general purposes. The springs manufactured here under the orders were only to be used as an integral part of the plaintiff's inside door lock—a fitness for a particular purpose. Such a purpose is equivalent to merchantability. Williston on Sales (2d Ed.) § 235, p. 457.

Under section 71 of the Sales Act of Connecticut (G. S. § 4737) and Ohio (G. C. § 8451) it is provided that, where any right, duty, or liability arises under a contract to sell by implication of law, it may be negatived or varied by express agreement, or by course of dealing between the parties, or by custom, if the custom be such as to bind both parties to the contract of sale. And as Williston on Sales (2d Ed.) § 246, p. 495, says, in referring to this statutory provision:

" * * * Under this statutory provision it has been held that a warranty may be attached by usage to a contract containing no express provision in regard to warranty, though in the absence of usage no warranty would be implied, and that a contract not expressly excluding a warranty may be shown to have been made without a warranty, though in the absence of usage a warranty would have been implied."

[6] By reason of section 16, subd. (c), no implied warranty may be imposed here, because the plaintiff had an opportunity for

reasonable examination of the samples in accordance with which they were manufactured. If there were any defects therein, it could have discovered them. Nor may it be argued now as a latent defect. The statute does not consider such latent defects. It expressly provides that no implied warranty of merchantability as regards defects discoverable upon reasonable examination of the samples may be imposed, if reasonable examination of the sample was accorded. Niehoff-Schultze Grocer Co. v. Gross, 205 App. Div. 67, 199 N. Y. S. 196 (affirmed 237 N. Y. 509, 143 N. E. 722). Plaintiff may not excuse itself because it did not sufficiently examine the samples. The samples were sent to it for the purpose of making examination and of assisting plaintiff to get the best results.

By section 15 of the Sales Act (G. S. Conn. § 4681, subd. 1; G. C. Ohio, § 8395), where the buyer expressly or by implication makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill and judgment, there is an implied warranty that the goods shall be reasonably fit for such purposes, and by subdivision 2 there is a warranty of merchantable quality, and subdivision 3 provides that, if the buyer has examined the goods, there is no implied warranty as regards defects which such examination would have revealed. Here the seller was not, by reason of his skill and judgment, in a better position than the buyer to determine whether or not the springs in question would be fit for the particular use for which they were intended by the plaintiff, and it was not justified and did not rely upon such skill and judgment in making its purchase. There is no such finding below. Indeed, the findings disclosed that the seller and buyer are on equal footing in regard to the ability to assert the suitability of the springs for the plaintiff's particular purpose. Williston on Sales (2d Ed.) § 234, p. 456; Wasserstrom v. Cohen, 165 App. Div. 171, 150 N. Y. S. 638.

Accepting the facts as found below, and having due regard for the custom of the trade, as the parties must in their ordinary business understanding, we hold there was no implied warranty of suitability of the springs to withstand breakage while used in plaintiff's locks, but rather that the defendant was co-operating in solving the problem of the plaintiff in securing an unbreakable spring in manufacturing its product. For failure to successfully solve this problem no liability may be imposed upon the defendant.

Judgment reversed, with costs.

SWAN, Circuit Judge (concurring specially). I agree that the judgment should be reversed, because in my opinion the proof of loss of profits and of injury to business was too speculative. I agree, also, that generally a sale of lock springs by a manufacturer does not imply a warranty that they are fit for the particular use for which the buyer intends them. But, under the facts of the instant case, as disclosed in the special findings, I think the District Court was right in holding that there was an implied warranty of fitness.