**BREINIG BROTHERS, Inc.,**
v.
**REGAL PLATING CO.**

**BREINIG BROTHERS, Inc.,**
v.
**VACUUM PLATING CORP.**

Civ. A. Nos. 1899, 1900.

United States District Court
D. Rhode Island.

Aug. 29, 1957.

Hinckley, Allen Salisbury & Parsons, Providence, R. I., Steven B. Ives, Providence, R. I., of counsel, for plaintiff.

Aram A. Arabian, Providence, R. I., for defendants.

DAY, District Judge.

The plaintiff in these actions seeks to recover the selling price of certain coating materials sold and delivered to the defendants. By agreement of the parties they were consolidated for trial. Jurisdiction of this Court is based on diversity of citizenship and the existence of a controversy in the required amount in both actions.

In its complaint against Regal Plating Co., a Rhode Island corporation, the plaintiff, a New Jersey corporation, alleges that between October 14, 1954 and June 22, 1955, the defendant ordered and plaintiff delivered to it certain goods and merchandise and that the defendant agreed to pay therefor certain sums of money; that the total value of the goods and merchandise so delivered was $10,-451.85; that the defendant paid on account thereof $1,985 on March 22, 1955 and $2,500 on April 21, 1955, and on May 19, 1955, returned merchandise to the plaintiff for which it received a credit of $123.50; and that the net amount due the plaintiff is $5,842.55 plus interest.

In its answer the defendant denies that it ordered the goods and merchandise as alleged by the plaintiff, denies that they had a value of $10,451.85, admits that the payments of $1,985 and $2,500 were made by it but denies that said payments were an acknowledgement that the goods and merchandise were in accordance with the orders therefor, denies that it owes the plaintiff said sum of $5,842.55 and asserts in its answer a counterclaim for damages against the plaintiff. In this counterclaim it alleges that in 1954 and 1955 the plaintiff agreed to supply it with certain goods and merchandise for a specific purpose known to the plaintiff and defendant; that the goods and merchandise supplied by the plaintiff were defective and wholly unsuited to the purposes for which they were manufactured and supplied, and that this defective material caused the defendant damages in the sum of $15,000 for other merchandise which was spoiled and had to be stripped, redone and repaired, wherefore it prays for judgment in its favor in the sum of $15,000 in its counterclaim and for its costs in the action against it.

The allegations of the complaint against Vacuum Plating Corp, are similar to those in the complaint against Regal Plating Co. except that the deliveries are alleged to have been made between January 6, 1955 and June 22, 1955 and that the amount claimed to be due and owing by the defendant is $8,119.23 plus interest. The answer of Vacuum Plating Corp, is similar to that filed in behalf of Regal Plating Co. and contains a similar counterclaim except that it alleges damages in the sum of $25,000 and prays for judgment in its favor in that amount on its counterclaim and for its costs in the action against it.

While the trial of these actions lasted for more than twenty full trial days, the issues developed therein are simple in the opinion of the Court.

The defendant corporations, during the periods involved herein, were engaged in the business of vacuum plating articles of jewelry for the manufacturers thereof on a contractual basis. This method of creating a desired finish on articles of jewelry is apparently a relatively new process and is used in substitution of the method of electro-plating generally previously used in the jewelry industry. The process cannot be said to be a simple one. It involves the spraying of the arti-

cle to be plated with a so-called base coat, its being baked in an oven for a prescribed period under a certain temperature, its being placed in a vacuum chamber where the desired finish is deposited upon it in minute particles, then being sprayed with a so-called top coat, further baking, etc.

The evidence shows that both of the defendants were controlled by one John Gulesserian who was the principal officer and active managing director of both. Gulesserian was apparently one of the pioneers in the vacuum plating field in this area. He testified that he had been engaged in this particular activity for a period of more than five years after having had many years of experience in the plating of jewelry by the electro-plating process.

Prior to July 1952 the defendant, Regal, purchased the coating materials used by it in its vacuum plating from a supplier named the Zapon Company, the sales representative of which was Everett Jenks. In July 1952 Jenks became the sales representative of the plaintiff. Shortly thereafter plaintiff began to manufacture coatings and other materials for use in the vacuum plating of articles of jewelry. Thereupon Jenks contacted Gulesserian and solicited the business of Regal. He submitted samples of plaintiff's products to Gulesserian and tests thereof were conducted by him in Regal's plant. After viewing the results of these tests Gulesserian caused Regal to cease doing business with Zapon and to have its needs supplied by the plaintiff. As the volume of Regal's business increased, Gulesserian caused the defendant Vacuum to be organized to engage in the same line of business. Vacuum also purchased its supplies from the plaintiff. Both defendants continued to do business with the plaintiff until June 22, 1955, as will hereinafter appear.

The evidence establishes that Jenks gave very close attention first to the business of Regal and after the organization of Vacuum to the business of both corporations. It appears that he spent many hours in the plant of Regal assist-ing it in its operations. There is a decided conflict in the testimony as to the reason for his activity. He contends it was to assist the defendant in eliminating certain production difficulties and to enable it to obtain a fuller finish on the plated articles. Defendants, on the other hand, contend that their only problem at all times was one of iridescence or a rainbowlike finish which made the plated articles unacceptable to the jewelry trade. Jenks contended that this condition occurred only on hot, humid days and that as yet no satisfactory method for its elimination under such conditions has been devised.

On the other hand, Gulesserian and other witnesses for the defendants insisted that from the beginning of their dealings, July 1952, plaintiff's materials always produced iridescent finishes. Defendants also produced testimony that in tests made in late 1954 the coating materials of certain other manufacturers, when run with plaintiff's at the same time in Regal's plant, produced finishes free from iridescence. Many hours were spent in the presentation of testimony as to the causes of iridescence and to the existence or non-existence of it at all times when plaintiff's materials were used. Defendants did concede, however, that when small articles of jewelry were plated they could "get away with" using plaintiff's materials.

Defendants presented testimony as to the costs incurred by them in scraping, replating and refinishing articles of jewelry claimed to be unacceptable because of iridescence and as to credits allowed to customers where it was not feasible to replate their jewelry. Despite the situation portrayed by the defendants' witnesses, they continued to do business with the plaintiff until June 22, 1955. During the period from October 14, 1954, to June 22, 1955, there were thirty separate deliveries of production order size to the defendant, Regal, and between January 6, 1955 and June 22, 1955, there were twenty-two similar deliveries to the defendant, Vacuum. None of these materials, except a small quanti-

ty of yellow paste, was ever returned by either of the defendants. Many of these deliveries represented re-orders of materials previously used by the defendants, any changes in their formulations being of a minor nature and in my opinion obviously unimportant.

The evidence further establishes that early in 1955, when both defendants were substantially in arrears, the plaintiff began to press for payment of their accounts. As a result Regal made payments of $1,958 on March 22, 1955, and of $2,500 on April 2, 1955. No payments were made by Vacuum. Despite these payments by Regal plaintiff was again exerting pressure for payment early in June 1955, when it suggested that Gulesserian personally endorse notes of the defendants covering the amount of all their purchases through May 1955. It caused such notes to be prepared and sent to Gulesserian, for execution by the defendants and for endorsement by him, by mail on June 24, 1955. Although their arrival was brought to his attention, Gulesserian testified he regarded them as unimportant and took no action with respect thereto. Shortly thereafter, plaintiff's sales manager, not having heard from Gulesserian, came to Providence, called upon him and endeavored to secure the execution of the notes, as he claims, in accordance with their earlier understanding. What happened at this interview is disputed. However, it is clear that Gulesserian did not sign the notes, and that he then expressed complete dissatisfaction with the plaintiff's products, claiming that they produced only iridescent finishes whereas, he said, the products of some of plaintiff's competitors had produced iridescence free finishes. At this juncture of the interview it appears that he was told in substance by plaintiff's sales manager that the defendants would perhaps fare better if thereafter they procured their coatings from other suppliers. Suffice it to say that the interview did not end on a friendly basis, no further sales were made by plaintiff to the defendants, and these actions were later instituted.

Gulesserian testified that the failure of the defendants to make payments on their respective accounts when due was occasioned by his desire to protect them against the damages they had sustained and were sustaining as a result of the defective quality of plaintiff's products and their lack of fitness for the use being made of them. It appears that in November 1954 the defendant Regal had been given a credit by plaintiff in the sum of $1,600 for coating materials returned by it and in satisfaction of its claims for losses occasioned by its use of the same during the late summer of 1954. When queried as to why the latter continued thereafter to use plaintiff's materials, Gulesserian testified in part as follows:

"Q. Why, after that trouble did you continue doing business with Breinig? A. Well I liked Everett Jenks. He was working hard to rectify the problems and troubles that I was having. * * *"

And upon cross-examination he had this to say:

"Q. And you used Breinig's for eight months? A. That is exactly true, due to my foolishness and loyalty to Mr. Jenks."

He also testified that both defendants had incurred substantial replating costs because of iridescence in periods prior to those during which the sales herein involved were made to the defendants.

At the conclusion of the evidence the defendants elected to waive their respective counterclaims and to set up against the plaintiff its alleged breach of warranty of fitness for a particular purpose by way of recoupment in diminution or extinction of the price of the materials sold and delivered to them by the plaintiff in accordance with the provisions of Section 7(1) of Chapter 464 of the General Laws of Rhode Island, Revision of 1938. Not having paid the plaintiff for its coating materials, this election of remedies was compulsory. See General Motors Truck Company v. Shepard Company, 47 R.I. 88, 129 A. 825.

There is no dispute as to the quantities and prices of the materials sold and delivered to each of the defendants. The sole question is—were they sold with a warranty, express or implied, that they were fit for a particular purpose and has there been a breach of any such warranty with resultant damages to each of the defendants which it may set up by way of recoupment in diminution or extinction of the price of the materials sold and delivered to it?

While I am satisfied that Jenks was most cooperative with both of the defendants and rendered every possible assistance to them directed toward getting the results desired by them, the credible evidence satisfies me that no express warranties or guarantees were ever made by him that plaintiff's materials would produce the results desired of them. Moreover, I find nothing in the dealings between the parties which can be the basis of any such conclusion. The fact that Jenks spent a great deal of his time in Regal's plant, working with its employees on their production problems and offering advice as the evidence clearly shows, does not establish any express warranty. As stated in Dunbar Bros. Co. v. Consolidated Iron-Steel Mfg. Co., 2 Cir., 23 F.2d 416, at page 418:

"Manufacturers should be free to lend advice and assistance to their customers in matters within their general knowledge, gained from their experience, without, in the absence of a promise so to do, guaranteeing the result."

Plaintiff contends that the sales involved herein were sales by sample and that accepting the testimony of the defendants that tests of every sample had produced iridescent finishes, it follows as a matter of law that there was no implied warranty of fitness for a particular purpose. In my opinion it is unnecessary for me to decide whether the sales were sales by sample. For the determination of these cases I shall assume, as the defendants maintain, they were not sales by sample and hence a determination by me of the nature or extent of the implied warranties in sales by sample becomes unnecessary.

The defendants also contend that under the circumstances shown in these cases there was an implied warranty of fitness for a particular purpose under the provisions of Section 15 of Chapter 459 of the General Laws of Rhode Island, Revision of 1938, the provisions of which are as follows:

"§ 15. Subject to the provisions of this title and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows: (1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose."

Under this section an implied warranty of the fitness for a particular purpose of the goods sold attaches where the buyer expressly or by implication makes known to the seller the particular purpose for which the goods are required and it appears that the buyer relies on the seller's skill and judgment. The basis of this implied warranty in a sale is justifiable reliance on the skill or judgment of the seller as shown by the circumstances of the particular transaction or transactions. Ford v. Waldorf System, 57 R.I. 131, 188 A. 633; Lepore v. Fuscellaro, 73 R.I. 467, 57 A.2d 442; The St. S. Angelo Toso, 3 Cir., 271 F. 245; Barrett Co. v. Panther Rubber Mfg. Co., 1 Cir., 24 F.2d 329; Giant Mfg. Co. v. Yates-American Mach. Co., 8 Cir., 111 F.2d 360; Jean Lang Dress Co. v. Robert Hirss Co., D.C.R.I., 141 F.Supp. 357; 1 Williston Sales § 235.

In these cases it is clear that the plaintiff was fully aware of the particular purpose for which the defendants required its products. Thus the first of the stat-

utory essentials for the existence of an implied warranty of fitness for a particular purpose has been established, that is, knowledge by the plaintiff of the intended purpose for which its coating materials were to be used by the defendants.

The second statutory essential for the creation of the implied warranty of fitness for a particular purpose is the buyer's justifiable reliance upon the seller's skill and judgment in using and continuing to use, as here, the seller's goods for the buyer's particular purpose.

 The burden of proving its justifiable reliance by a fair preponderance of the credible evidence rested upon each of the defendants. For the limited purpose of determining whether the defendants have sustained the burden imposed upon them in this regard, I shall accept as true that plaintiff's materials from the beginning of July 1952 produced the unacceptable rainbow finish and that every lot of jewelry that was plated with plaintiff's materials contained some pieces marked by this undesirable condition. For the same purpose I shall accept as true their claims that each during the periods involved herein was sustaining as a result of its use of plaintiff's materials damages that were running into thousands of dollars. I shall also accept as true the testimony that each defendant had sustained similar losses from the use of plaintiff's material prior to the periods concerning which they presented evidence. Likewise, I shall accept as true their testimony that as early as November 1954 the defendant Regal had conducted comparative tests under like conditions between plaintiff's materials and those of certain of its competitors and that plaintiff's materials always produced an unsatisfactory finish while those of its competitors produced an iridescent free finish. Despite these tests and despite the unsatisfactory results which defendants claim were being obtained from plaintiff's materials during the periods involved herein (and which had been obtained prior thereto) the defendants continued to purchase them until June 22, 1955.

Moreover, during these periods none of them, with the exception of a small quantity of yellow paste, was ever returned. Nor was any attempt ever made to return any of them although it is clear that in November 1954 a substantial credit was allowed to Regal for materials returned by it and for damages alleged to have resulted from their use. In my opinion, the testimony offered by the defendants effectively negates any justifiable reliance by them on the skill and judgment of the plaintiff. On the contrary, it establishes an unreasonable and unjustifiable reliance, if in fact there was any reliance, as claimed by the defendants. The explanation of Gulesserian that he continued to do business with the plaintiff because of his affection for and loyalty to Jenks requires no comment.

In my opinion under the circumstances shown in these cases there was no implied warranty of fitness for a particular purpose for the breach of which the defendants are entitled to set up their alleged damages in diminution or extinction of their indebtedness to the plaintiff.

 While I am deciding these cases upon the narrow ground that there was no implied warranty of fitness for a particular purpose and hence no breach thereof, for which the plaintiff would be answerable in damages, I do not mean to indicate that I am finding that plaintiff's materials were not of merchantable quality. On the contrary, after a careful consideration of all the testimony, including that relating to the causes of iridescence and to the many factors which may affect the quality of the finish obtained by the vacuum plating process, I am of the opinion that the coating materials which the plaintiff sold and delivered to each of the defendants were at least of merchantable quality.

Judgment may be entered in favor of the plaintiff against the defendant Regal for the sum of $5,842.55 plus interest thereon from June 22, 1955, in the sum of $759.54, and for the plaintiff against the defendant Vacuum for the sum of $8,119.23 plus interest thereon from June 22, 1955, in the sum of $1,055.50.