In the Matter of **BELLE–MOC, INC.,**
Debtor.

No. 7–196.

United States District Court
D. Maine, S. D.
March 30, 1960.

Edward G. Proctor, Boston, Mass., John A. Mitchell, Portland, Me., for petitioner.

Robert W. Meserve, Boston, Mass., Lawrence B. Urbano, Williamstown, Mass., Herbert H. Bennett, Portland, Me., for debtor.

GIGNOUX, District Judge.

This matter is before the Court on the petition of the United Shoe Machinery Corporation to review an order of the Referee in Bankruptcy entered in proceedings to confirm a plan of arrangement under Chapter XI of the Bankruptcy Act, 11 U.S.C.A. §§ 701 et seq., filed by Belle-Moc, Inc., a Maine shoe manufacturing corporation. By his

order the Referee disallowed a proof of claim filed by United in the amount of $6,016.14 for approximately 1,333 pairs of lasts [1] sold to Belle-Moc by the United Last Company Division of United, and ordered judgment in the amount of $93,672.49 on a counterclaim filed by Belle-Moc against United for damages sustained by Belle-Moc in using these lasts to manufacture shoes which were rejected as defective by its customer. The Referee's action followed from his finding of a breach of implied warranty by United in the sale of the lasts. No question has been raised concerning the summary jurisdiction of the Bankruptcy Court to hear and determine the counterclaim.

Belle-Moc, Inc., of Lewiston, Maine, is engaged principally in the manufacture of shoes for women. The United Last Company Division of United is a last manufacturer, with which Belle-Moc had done business for 14 years. During the 12 years previous to the present controversy, United had sold Belle-Moc about 95% of all the lasts purchased by the latter. Joyce, Inc., of Cincinnati, Ohio, itself a shoe manufacturer, became a new customer of Belle-Moc in 1956 and in September of that year placed an order with Belle-Moc for many thousands of pairs of "Suburban" shoes for delivery in December, 1956 and January, 1957. Contrary to the usual custom in the trade, Joyce demanded that it receive shoes of various test sizes for approval ahead of bulk shipments. To manufacture the "Suburban", Belle-Moc first purchased sample lasts from the Sterling Last Company of Brooklyn, New York, but when difficulties were encountered with shoes manufactured on the Sterling last, Belle-Moc turned to United, undoubtedly because of their long prior association, for a solution to its problem.

In purchasing lasts, the shoe manufacturer basically relies upon the fit of the shoes made on a size 4B last. It is the key model because if the size 4B is satisfactory, all other sizes will fit well, provided the smaller and larger lasts are properly graded from the size 4B model by the last manufacturer. The size 4B shoes are therefore tested extensively by the shoe manufacturer for both fit and wear, and the results of this key test are always submitted to the manufacturer of the last.

Once the basic 4B model last has been approved, it is customary for the shoe manufacturer to obtain lasts of sizes 6B and 8B in order to check and grade the upper patterns. Shoes manufactured on these larger model lasts are examined by a brief "parade" test, which involves having women, selected from the employees in the factory, walk up and down a distance of some thirty feet, snapping the top lines and observing how the shoes look on their feet. The "parade" test is a test for fit only, and not for wear. A report of this test is not expected by the manufacturer of the lasts when the results of the 4B test are satisfactory.

In the present instance, after extended preliminary joint efforts to develop a proper 4B last for manufacture of the "Suburban", a 4B model last was manufactured by United and shipped to Belle-Moc. Extensive tests by Belle-Moc, in the presence of a United salesman, who was also a last expert, on shoes manufactured on this sample last proved highly successful, and United was notified of the favorable results. Subsequently, Belle-Moc made shoes on 6B and 8B sample lasts manufactured by United for the purpose of checking the upper patterns. These shoes were given the "parade" test, also in the presence of the same United representative, and found to be satisfactory. In accordance with the usual custom, an extensive wear test such as that conducted on the 4B was not performed.

■ Being satisfied with the results, Belle-Moc on October 11, 1956 placed its order with United for 1,218 pairs of lasts, which were mostly shipped by late October. On November 5 Belle-Moc placed a second order for 63 pairs of

---

1. Lasts are wooden forms, in the shape of a foot, upon which shoes are manufactured.

lasts of varying sizes, which were shipped between November 9 and 21. On December 5 Belle-Moc gave a third order for 6 pairs of lasts, which were shipped on December 11.[2] There is no contention by Belle-Moc, and indeed there is no evidence in the record, that the lasts shipped by United in fulfillment of the production orders varied in any way from the sample lasts supplied for testing purposes.

Before Belle-Moc gave any production orders, it had ordered some 47 pairs of sample lasts, covering a wide range of sizes and widths. Some of these were obtained to check and grade upper patterns; others were obtained to make sample shoes for Joyce's approval as required in Joyce's original order.[3] When Belle-Moc placed its first production order on October 11, it had not as yet heard from Joyce as to the results of its tests of these sample shoes. A favorable report was received, however, on October 24, before any production lasts were delivered to Belle-Moc.

Production of the "Suburban" shoes on the United last began in early November. Bulk shipments were made to Joyce in December, 1956 and January, 1957, and by January 15 some 18,121 pairs of shoes had been received by Joyce. Before shipping these shoes to its customers, Joyce examined them carefully and found them to be satisfactory, with the exception of around 350 pairs, which were returned because of defects unrelated to the present controversy. But shortly after Christmas, reports were received from Joyce's retail customers that the shoes in the larger sizes gapped along the top lines and thus did not fit properly. There was no problem with regard to the smaller sizes (fours, fives and sixes). When the problem could not be corrected, Joyce recalled the shoes for full credit and around the latter part of January disposed of them by selling them to Mosinger-Cohn, a dealer in job merchandise, for the relatively low price of $54,383.87. Before purchasing the shoes, an experienced representative of Mosinger-Cohn spent a full day at Joyce's plant inspecting and testing them. Although he knew that they were rejected merchandise, he was unable to find any serious defect. Later, as in Joyce's case, they were rejected by the retail customers because they gapped along the top lines.

While the counterclaim contained a count in negligence, Belle-Moc's case before the Referee was based upon an alleged breach by United of implied warranties of fitness for a particular purpose and of merchantability under Sections 15 and 16 of the Uniform Sales Act.[4] United denied liability on two

2. The facts concerning Belle-Moc's second and third production orders, although not in dispute, were not found by the Referee, evidently because he felt that they were not material to his decision. The petitioner wishes this Court to find them, however, and the Court will do so in order to make the findings complete. There appears to be no question of the power of the Court to make such supplementary findings, at least when the facts are uncontroverted. See In re J. Rosen & Sons, 3 Cir., 1942, 130 F.2d 81, 84; In re Sparta Canning Co., 7 Cir., 1934, 73 F.2d 732; In re Kellar, 1 Cir., 1912, 192 F. 830. Compare Helliwell v. Haberman, 2 Cir., 1944, 140 F.2d 833 (function of Court of Appeals). Compare 2 Collier on Bankruptcy par. 39.25, at 1495 with par. 39.28, at 1497 (14th ed. 1956).

3. All but 14 of these sample lasts had been received by Belle-Moc prior to October 11, and the remaining 14 were shipped by United on October 15. The sample lasts which Belle-Moc had received prior to October 11 were of the following sizes and widths: 4B (13 pairs), 6B (3 pairs), 6½B (1 pair), 8B (3 pairs), 5AA (3 pairs), 6½AA (1 pair), 7AA (3 pairs), 7½AA (1 pair), 9AA (3 pairs), 8AAA (1 pair) and 8AAAA (1 pair).

These facts were also not included in the Referee's findings. Since they are not in dispute, the Court will find them in order to make the findings complete. See footnote 2, supra.

4. Maine R.S.1954, ch. 185, secs. 15, 16. Since the applicable sections of the Sales Act are identical in both Massachusetts and Maine and there is no apparent difference in interpretation, the parties agree that a problem of conflict of laws is not involved.

grounds, which are presently material: first, United contended that the gapping was not caused by any defect in the lasts manufactured by it, but by a combination of faults in the manufacture of the shoes by Belle-Moc; second, United argued that even if defects in its lasts were the cause of the gapping, there was no implied warranty, because Belle-Moc did not rely on United's skill or judgment, as required by the Uniform Sales Act, but rather obtained model lasts of the larger sizes for testing purposes and found them to be satisfactory before placing its bulk order. As a corollary to this second defense, United's position was that any implied warranty in the sale of these lasts was further negatived under the Act because the defect was patent, not latent, and would have been revealed by a reasonable examination by Belle-Moc.

After an extensive hearing, the Referee resolved both of the foregoing issues in favor of Belle-Moc. On the question of causation, his finding was as follows:

"On the basis of the entire record, therefore, this Court is compelled to conclude as a matter of fact that the poor fit of the shoes was due to defective lasts manufactured by United."

On the second issue, his conclusion was:

"Under all of the facts and circumstances of this matter, therefore, this Court concludes that Belle-Moc was justified in relying upon United's skill and judgment to grade the lasts properly from the accepted 4B model, that the tests conducted by Belle-Moc of the 6B and 8B models were reasonable and that the defect was of a nature that it would not have been revealed by such tests."

It is only these two findings which United assails in the present petition for review. Other elements of liability and the amount of damages found by the Referee are thus of no concern to the Court in this proceeding.

## I.

The Referee's finding with respect to the cause of the gapping of the shoes was exclusively one of fact, which must be accepted by the Court upon this petition for review unless it is "clearly erroneous." General Order in Bankruptcy 47, 11 U.S.C.A. following section 53; 8 Collier on Bankruptcy par. 3.30 (14th ed. 1941). A review of the parts of the record cited to the Court does not establish that the Referee was "clearly erroneous" in his finding that defects in United's lasts were the cause of the gapping. In fact, in the opinion of this Court, the evidence, much of which was uncontradicted, clearly demonstrates the correctness of the Referee's finding as to the cause of the gapping.

The Referee found from a number of circumstances that the gapping could not have been caused by faults in the manufacturing of the shoes, as alleged by United, and that thus the problem must have been with the lasts. Among these circumstances were the following: the "Suburban" shoes were all manufactured by the same shoe-making technique, and yet only the larger sizes gapped, and the gapping grew progressively worse as the sizes increased; extensive tests by experienced personnel of Belle-Moc, United and Joyce did not reveal a poorly manufactured product; and when the gapping problem was discovered, the concerted efforts of a combination of shoe experts, including United employees, failed to produce a proper fitting shoe on the United lasts, while shoes made on two other manufacturers' lasts, using essentially the same manufacturing techniques, produced shoes which fitted properly.

The only attack by United upon the above findings of the Referee, which were not challenged in the petition for review itself, was a reference in oral argument to some testimony in the record tending to show that the manufacture of the shoes was improper, and particularly that the heels were improperly made. But the foregoing circumstances relied upon by the Referee were all supported by substantial evidence, for the most part uncontradicted, and the Referee's conclusion therefrom seems to be irrefutable.

The Referee buttressed his finding as to the cause of the gapping by an analysis of the technical aspects of last manufacturing, stating:

"While these factual circumstances support the seemingly inevitable conclusion that the trouble with the fit of the shoes was due to defective lasts, expert testimony on the technical aspects of manufacturing lasts substantiates it."

On the basis of expert testimony, the Referee concluded that United "failed to exercise sound judgment" in deciding to grade the lasts according to the so-called standard method, rather than by the method known in the trade as "slip-grading", and that United's failure to slip-grade the larger lasts was the cause of the poor fit of the shoes. It is this conclusion which United so vehemently assails in its petition.

It is important to note that the Referee made findings with respect to the technical aspects of last manufacturing only in order to "substantiate" his already found conclusion as to the cause of the gapping. But because United has expended so much effort attacking the Referee's analysis and because the Referee might conceivably wish to revise his conclusion if his technical analysis were found to be in error, the Court will set forth those features of the last manufacturing process disclosed by the evidence which convince the Court that the Referee not only was not clearly erroneous, but was entirely correct.

Upon the following aspects of the extremely technical process of last manufacturing, United and the Referee are in agreement. Before producing lasts on a volume basis, the last manufacturer first must obtain last models which are commonly referred to as "turning" models. Making these models is a crucial operation requiring considerable skill and judgment. Once the turning models have been made, volume production of the lasts is primarily mechanical.

The process is begun by making a size 4B model, largely by hand. This is the basic model from which the others are made. As previously noted, it is for this reason that shoes made on the 4B last are tested extensively.[5] Because of certain distortions which occur in producing lasts of sizes different from the 4B model, it is customary in the industry to establish a turning model for each two sizes removed from the 4B—usually just a 6B and an 8B. This is accomplished on a lathe. The smaller model is spun in one part of the lathe, from which feelers transmit its contours to cutting tools which fashion the larger last out of a block of wood spinning in the other part of the lathe. To check these larger-sized lasts for accuracy as to length and size, the model maker makes a guide or ruler, called a bottom pattern. This is a piece of heavy paper which represents the entire bottom area of the last. A model, when turned, is always made to conform to the bottom pattern produced for that model.

The 4B bottom pattern is obtained by simply tracing the bottom of the 4B model last on paper and making a metal reproduction of it. The larger-sized bottom patterns are graded up from the basic 4B bottom pattern by a grading machine. There are two regularly employed methods of accomplishing this upgrading. The standard method results in the 6B and 8B bottom patterns being exactly the same shape as the 4B, but larger by $\frac{1}{3}$ of an inch per size, or $\frac{2}{3}$ of an inch for the 6B and $\frac{4}{3}$ of an inch for the 8B. United graded up its bottom patterns by this standard method.

The second method is called slip-grading. When this method is used, the 6B and 8B bottom patterns are still the same shape as the 4B, but they are larger by slightly *less* than $\frac{1}{3}$ of an inch per size. Last manufacturers differ as to when they should slip-grade, but they all agree it becomes more and more necessary as the height of the heel increases. The heel of the "Suburban" shoe was $\frac{5}{8}$ of an

---

5. There is no question but that the 4B model last was proper in this case.

inch, which is within the area of disagreement between last manufacturers as to the propriety of slip-grading.

The purpose of slip-grading is to maintain the stick-length of the last, which is its length from the extremity of the toe to the extremity of the heel. The stick-length is the length which all last manufacturers agree must increase exactly ⅓ of an inch per size. In a high-heeled shoe, since the height of the heel in all sizes stays nearly constant,[6] and since the toe-spring [7] remains constant, the larger lasts when fitted to the heel do not come up off the floor at as sharp an angle as the 4B. The bottom pattern if fitted against the bottom of the last starts at the toe off the floor, comes down to the floor at the ball-break [8] and then goes up at an angle towards the heel. A simple experiment with triangles will show that as the larger lasts flatten out with relation to the floor, the bottom of the last will not increase in length as rapidly as will the stick-length of the last. Thus since the stick-length must be ⅔ of an inch greater in the 6B last and ⁴⁄₃ of an inch greater in the 8B last, and since the bottom pattern determines the length of the last, the bottom pattern must be lengthened *less* than ⅓ of an inch per size. It may thus be seen that slip-grading ultimately *shortens* the last. This is not controverted.

There is also a process known as drawing or lengthening the forepart of the bottom pattern. This, unlike slip-grading, actually changes the proportion of the bottom pattern (and the corresponding last) by lengthening the forward part at the expense of the back part and moving the ball-break farther back. This is a very unusual practice in the industry, but some think it necessary because in a larger foot the forepart is exaggerated.

At this point United parts company with the Referee's analysis. The Referee found, in accordance with the testimony of a Mr. Berry, a shoe-making expert who was retained by Belle-Moc in an effort to solve the gapping problem, that the problem in United's larger lasts was that the ball of the foot was hitting behind the ball-break of the shoe, the position of which was of course determined by the last, and thus the main weight of the body was pushing down behind the point where it should, causing the shank of the shoe to break down and the top lines to open up. The Referee further found, in conformity with Mr. Berry's opinion, that by slipping the grade and drawing the forepart of the bottom pattern, United could have corrected the gapping, because the effect of both operations is to move the ball-break of the shoe backwards *in relation to the foot.* There was uncontradicted evidence that Mr. Berry had performed both operations in making larger-sized lasts from a 4B last essentially similar to the United 4B last, and that shoes made on these larger lasts then fitted properly without gapping.

United maintains that while drawing the forepart admittedly has the effect of moving the ball-break backward, slipping the grade has the opposite effect and that, therefore, Mr. Berry's opinion and the Referee's finding as to the cause of the gapping are in error. United argues that it is necessary to look at the bottom pattern from the toe, because the machine which grades it starts from the toe.

It is surely an undeniable physical fact that, regarded from the toe, slipping the grade, which merely shortens the bottom pattern uniformly through its entire length, moves everything, including the ball-break, forward and closer to the toe. But the important consideration is what happens to the foot when the bottom pattern is slip-graded. When the

---

6. Actually in the present case, the heels on the larger sizes were made a little higher, but this increase is so slight as not to affect the analysis.

.7. The toe-spring is the height of the toe of the last off the floor.

8. This is the widest part of the last, which is meant to correspond with the ball of the foot.

shoe is shortened by slip-grading the bottom pattern, the foot obviously remaining constant in size, there must be some slack in the fit taken up somewhere. And if the heel of the foot is flush against the back of the shoe made on an un-slip-graded longer last, when the last and shoe are shortened, the heel must still be flush, and the slack is necessarily taken up in the forward areas of the shoe. This is what the record indicates, what the Court would expect, and what the Referee tacitly found when he concluded that the ball-break of the shoe came backwards *in relation to the foot* when the last was slip-graded, viz., that the ball of the *foot* moved forward in the shoe. The Court can only agree with this highly technical finding.

■ United notes that there is genuine disagreement in the industry as to when to slip-grade, that drawing the forepart is highly unusual, and that therefore there was no basis for the Referee's finding that United "did not exercise sound judgment" in failing to use these operations. The Referee's choice of words here was perhaps unfortunate, since it implies that the Referee was thinking in terms of negligence. It is clear, however, that breach of warranty is not predicated on negligence. See, e. g., Holt v. Mann, 1936, 294 Mass. 21, 24, 200 N.E. 403, 405; 1 Williston on Sales § 237 (rev. ed. 1948). All the Referee needed to find was that the lasts were defective and that this defect caused the misfit of the shoes. He found at least this much, and as already said, the Court must agree.

## II.

United's attack upon the Referee's finding that there was a breach of implied warranty by it in the sale of the lasts is essentially two-fold: first, United contends that there was no implied warranty because Belle-Moc did not rely on United's skill or judgment, but obtained model lasts of the larger sizes, which both Belle-Moc and Joyce tested and found satisfactory before bulk pro-

duction was ordered; second, United argues that there was no implied warranty because the defect, if any, in the lasts was a patent defect which would have been revealed by a reasonable examination by Belle-Moc. No other attack is made by United upon the Referee's finding of breach of implied warranty.

The Referee's finding presents no substantial issue of law. Liability is controlled by the provisions of sections 15 and 16 of the Uniform Sales Act,[9] and the parties are in agreement that the following portions of these sections are the only ones material to this proceeding:

"Sec. 15. Implied warranties of quality.

\* \* \* \* \* \*

"I. Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, whether he be the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose.

\* . \* \* \* \* \*

"III. If the buyer has examined the goods, there is no implied warranty as regards defects which such examination ought to have revealed."

"Sec. 16. Implied warranties in sale by sample.—In the case of a contract to sell or a sale by sample:

\* \* \* \* \* \*

"III. If the seller is a dealer in goods of that kind, there is an implied warranty that the goods shall be free from any defect rendering them unmerchantable which would not be apparent on reasonable examination of the sample."

■■ Regardless of which section is invoked, an implied warranty does not arise unless it appears that the buyer justifiably relied upon the seller's skill or judgment. Parker v. S. G. Shaghalian & Co., 1923, 244 Mass. 19, 138 N.E. 236;

9. See footnote 4, supra.

Maryland Casualty Co. v. Independent Metal Products Co., 8 Cir., 1953, 203 F. 2d 838; Dunbar Bros. Co. v. Consolidated Iron-Steel Mfg. Co., 2 Cir., 23 F.2d 416, certiorari denied, 1928, 277 U.S. 599, 48 S.Ct. 560, 72 L.Ed. 1007; 1 Williston on Sales §§ 234–5 (rev. ed. 1948). And both sections 15 and 16 absolve the seller if a defect would be apparent on reasonable examination of the product by the buyer. As the Referee correctly pointed out, however, a buyer is protected against latent defects. Kurriss v. Conrad & Co., 1942, 312 Mass. 670, 46 N.E.2d 12; Parker v. S. G. Shaghalian & Co., 1923, 244 Mass. 19, 138 N.E. 236; Himmelstein v. Budner, D.C.D.C.1950, 93 F.Supp. 946. See 1 Williston on Sales §§ 234–5 (rev. ed. 1948). But if the buyer relies on his own skill and judgment, he is not protected by the fact that the defect was latent. See 1 Williston on Sales §§ 234–5 (rev. ed. 1948).

■ In the final analysis, the question of United's liability for breach of implied warranty depends upon whether, under the circumstances of this sale, there was justifiable reliance by Belle-Moc upon United's skill or judgment in the manufacture of the larger-sized lasts. See 1 Williston on Sales §§ 234–5 (rev. ed. 1948). Upon this petition for review, the Referee's findings, unless "clearly erroneous," must be accepted by the Court. General Order in Bankruptcy 47, supra; In re Skrentny, 7 Cir., 1952, 199 F.2d 488, 492. In the opinion of this Court, the Referee's findings upon this issue are not only not "clearly erroneous," but are supported by substantial evidence, for the most part uncontradicted, and are clearly correct. In considering the question of reliance, the Referee among other things said:

"No factor is more persuasive in determining the matter of reliance than the emphasis placed by both the last and shoe manufacturer upon obtaining a proper 4B model last. United and Belle-Moc worked in close conjunction with each other with regard to the extensive tests that were conducted on this model. As an indication of the high regard in which United was held in this field, whenever any difficulty was experienced, Belle-Moc would promptly refer to United for further suggestions and modifications.

"Once the 4B model was accepted, the function of producing larger sized models was performed exclusively by United. The process of grading lasts upward from the 4B involves extraordinary skill and judgment on the part of the model makers. And, except for a narrow area of disagreement, it appears that the standards for grading lasts are so well established that errors rarely, if ever, occur. At least, Belle-Moc had never experienced any difficulty with lasts during the fourteen years it had done business with United. Even when the problem with the 'Suburban' was encountered, it is significant that Belle-Moc did not question the accuracy of the lasts until all other possibilities for the cause of the defect had been eliminated.

"Regarding further tests of the lasts, the testimony is uncontradicted that the 6B and 8B last models were ordered only for the limited purpose of checking and grading the upper patterns. Any examination of the shoes with regard to their fit was confined to the brief observations by the so-called 'parade' test, in conformance with the custom in the industry. And not only was United fully aware of this procedure, it participated in the examinations through its salesman under circumstances which indicated approval of the system.

"Similar tests were conducted by Joyce and Mosinger-Cohn. Neither Belle-Moc nor anyone else detected any difficulty with the fit of the 'Suburban'. On the contrary, Belle-Moc was commended for its fine craftsmanship."

The Court concurs fully in the views thus expressed by the Referee. United argues strenuously in this proceeding,

however, that the Referee's ultimate finding of reliance by Belle-Moc on United's skill and judgment in the production of the larger-sized lasts is conclusively negatived by the undisputed facts, which the Referee failed to include in his findings, concerning the extensive tests made by Belle-Moc and Joyce of shoes made on sample lasts of various sizes which had been obtained prior to the placing of any bulk orders. As previously noted, the Court has found these facts in order to complete the findings.[10] But United fails to point to any portion of the record where there is testimony that either Belle-Moc or Joyce conducted any tests, other than the brief "parade" test and other cursory tests for fit customary in the trade, of shoes made on these larger-sized sample lasts. On the contrary, the testimony is undisputed, as the Referee found, that Belle-Moc's testing of the 6B and 8B last models, which were the only larger-sized lasts it tested by the "parade" test, was solely for the purpose of checking the upper patterns and observing the fit of the shoes. The record is further wholly devoid of evidence that Joyce wear tested any of the additional sample lasts which it ordered. Furthermore, there is no showing whatsoever that Belle-Moc relied in any manner upon the tests conducted by Joyce. In fact, any contention that Belle-Moc was relying upon Joyce's skill or judgment in the testing of shoes made on the sample lasts would seem to be precluded by the undisputed fact that Belle-Moc placed its first, and major, production order with United before Joyce had reported the results of its tests.

United also vehemently challenges in this proceeding the Referee's finding that the defect in the lasts was of such a nature that it would not have been revealed by the tests conducted by Belle-Moc of the larger-sized models. United does not appear to suggest that the tests made by Belle-Moc were not reasonable, as they were admittedly at least as extensive as was customary in the trade and were conducted in the presence of the United representative. Rather, United maintains that the defect was shown by the testimony to have been apparent, or patent, and one which ought to have been revealed by the tests which were made. The defect ought to have been revealed, United argues, "since all the testimony is that the gapping of the shoes became apparent immediately on their being tried on by the models or by the customers."

The short answer to United's argument is that the quoted statement simply is not true and the Referee's finding to the contrary, far from being "clearly erroneous," is clearly correct. Although there was some slight conflict in the testimony on this point, the overwhelming weight of the evidence, both as presented by Belle-Moc and as presented by United, was that the problem of gapping developed only after the shoes had been worn for some time, at least overnight and usually from two to three days. The testimony to this effect is corroborated by the undisputed evidence that the tests of many sizes conducted by Belle-Moc, by Joyce and by Mosinger-Cohn did not reveal the defect, and that all three concerns, although experienced in the trade, proceeded to invest substantial sums of money in the manufacture or purchase of the shoes. It is further substantiated by the fact that even after the gapping problem was discovered, experts retained by Belle-Moc, Joyce and United were unable for many weeks to find its cause.

United is not aided by the cases which it has cited to the Court. It relies most heavily on Dunbar Bros. Co. v. Consolidated Iron-Steel Mfg. Co., 2 Cir., 23 F. 2d 416, certiorari denied, 1928, 277 U.S. 599, 48 S.Ct. 560, 72 L.Ed. 1007, in which the court held that there was no implied warranty in a sale by a spring manufacturer to a lock manufacturer of springs which fractured because of defects in their design. The evidence in that case showed that by the custom of the trade spring manufacturers did not warrant the suitability of the design or temper of the springs for any particular pur-

10. See footnotes 2 and 3, supra.

pose. The record further disclosed that the springs involved had been manufactured by the seller in accordance with specifications prepared by the buyer, with only incidental advice and assistance from the seller. The court also relied upon the crucial finding that reasonable examination by the buyer would have disclosed the defect. In negativing reliance, the court stated (23 F.2d at page 420):

> "Here the seller was not, by reason of his skill and judgment, in a better position than the buyer to determine whether or not the springs in question would be fit for the particular use for which they were intended by the plaintiff, and it was not justified and did not rely upon such skill and judgment in making its purchase. There is no such finding below. Indeed, the findings disclosed that the seller and buyer are on equal footing in regard to the ability to assert the suitability of the springs for the plaintiff's particular purpose."

The remaining cases upon which United relies are similarly distinguishable. In Egyptian Chemical Co. v. General Products Co., 1 Cir., 1956, 229 F.2d 263, it appeared that the defective lampshades involved represented an experimental venture by the buyer, a manufacturer of funeral supplies, in the development of a molded plastic lampshade for sale to the funeral trade. The entire project was the idea of the buyer, who had even applied for a patent on the design. The buyer furnished the seller with detailed specifications and directions for the manufacture of the lampshades, examined and approved all samples, and at no time placed any reliance upon the seller's skill or judgment.

In Maryland Casualty Co. v. Independent Metal Products Co., 8 Cir., 1953, 203 F.2d 838, the Fruehauf Trailer Co., a large manufacturer of tank-trailers, purchased a 4,000-gallon metal tank for the transportation of gasoline from the defendant, a small operator who manufactured only for Fruehauf. A piece of foreign matter in the tank caused a valve to jam, and a fire resulted. The record showed that Fruehauf determined the design, material and method of manufacture of the tank; that the work which the defendant did was completely specified by Fruehauf; and that every phase of the operation was under the constant supervision of Fruehauf, who was exclusively responsible for inspection of the finished tank before delivery. The court found no evidence that Fruehauf relied in any manner upon the defendant's skill or judgment in the manufacture of the tank.

American Radiator & Standard Sanitary Corp. v. Titan Valve & Mfg. Co., 6 Cir., 1957, 246 F.2d 947, was an action by a manufacturer of hot water heaters for indemnity against the supplier of a thermal unit incorporated in one of plaintiff's heaters for liability incurred as the result of an explosion caused by a defective valve in the thermal unit. The evidence was that the plaintiff, which over a long period had purchased thermal units for its heaters from the defendant, had without exception checked them in an elaborate series of tests and had rejected them in large numbers because of defective valves. In view of this fact, the court found that in assembling its heaters plaintiff did not rely upon defendant's skill or judgment, but relied upon its own tests. The court further concluded that because of its past unsatisfactory experience with defendant's units and the long history of rejections, plaintiff could not have justifiably relied upon defendant's skill.

In Gillette v. Kelling Nut Co., 4 Cir., 1950, 185 F.2d 294, it is perfectly clear that the plaintiffs, in the purchase of the peanuts there involved, acted upon inspection and extensive laboratory tests of the peanuts by plaintiffs and their proposed customer, and not upon anything said or done by defendant.

For the foregoing reasons, the Referee's order must be, and is:

Affirmed.