**EGYPTIAN CHEMICAL CO.,**
Plaintiff, Appellant,

v.

**GENERAL PRODUCTS COMPANY,**
Inc., Defendant, Appellee.

**No. 5005.**

United States Court of Appeals
First Circuit.

Heard Dec. 7, 1955.

Decided Jan. 19, 1956.

—————◆—————

Robert W. Cornell, Boston, Mass., for appellant.

Edward B. Hanify, Boston, Mass., with whom Levin H. Campbell, III, and

Ropes, Gray, Best, Coolidge & Rugg, Boston, Mass., were on brief, for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

The complaint in this case was in the nature of an action for breach of contract or breach of warranty. It was originally filed in the Superior Court for Suffolk County, Commonwealth of Massachusetts, and later removed to the United States District Court on the ground of diversity of citizenship.

In its answer the defendant denied the material allegations of the complaint with reference to breach of contract and breach of warranty. In addition, the defendant filed counterclaims against the plaintiff on a certain trade acceptance and a certain promissory note executed by the plaintiff.

At the conclusion of the evidence the defendant moved for a directed verdict on the complaint, which motion the district court took under advisement, with a reservation to act on the same at the conclusion of the trial. See Rule 50(b), F.R.C.P., 28 U.S.C.A. The jury brought in a verdict of $25,000 in favor of the plaintiff on the complaint, and a verdict for $8,489.95, with interest, in favor of the defendant on its counterclaims. Thereafter the district court allowed a motion by defendant for judgment notwithstanding the verdict as to the plaintiff's claim, and allowed a motion by defendant for judgment pursuant to the verdict in respect of its counterclaims. A judgment was entered accordingly. Plaintiff filed a notice of appeal from that part of the final judgment which was based upon the allowance of defendant's motion for judgment notwithstanding the verdict. Thus the judgment in favor of the defendant on its counterclaims is not now before us for review.

So far as we can perceive, the case presents no substantial issues of law; and we are of the opinion that on the facts the district court committed no error in granting judgment for the defendant notwithstanding the verdict.

The facts are quite lengthy and complex, but for present purposes we may curtail somewhat the factual statement.

As the case has been presented to us, it is necessary to consider only the cause of action set out in the first paragraph of Count 5 of the complaint, alleging as follows:

"*Count 5*—The plaintiff says that on or about March 16, 1948 the plaintiff and the defendant entered into an agreement, evidenced by writings, signed by both parties, under the terms of which the defendant agreed to manufacture and deliver to the plaintiff 5,000 lamp shades which would be of merchantable quality, reasonably fit for a purpose intended and made known to the defendant, and free from any defects rendering them unmerchantable, which defects would not be apparent on reasonable examination; that the defendant did fail to manufacture and deliver such lamp shades in accordance with its agreement, all to the damage of the plaintiff."

It appears that the plaintiff Egyptian Chemical Co. was a manufacturer of embalming fluid and funeral supplies. Some time in 1947 plaintiff's president, Herman A. Snider, conceived the idea of selling plastic lamp shades to the funeral trade in place of the conventional glass shades. This idea represented an experiment, since hitherto no such plastic shades had been put on the market or manufactured. Snider was well aware of the problem of manufacturing a shade made of thermoplastic material, in that the continual application of high temperatures to the plastic material would affect it in such a way as to render it useless for lamp shades of the usual type. He discussed the idea of a plastic shade with a patent attorney as early as June, 1947. At

about the same time he also discussed the idea with Mr. Jack Beaty, who later became the plaintiff's chief salesman. In December, 1947, Snider and Beaty consulted a representative of the duPont Company, who suggested the use of duPont nylon, and recommended the defendant, a custom molder of plastics.

Accordingly, Snider got in contact with Mr. Clifford A. McBride, defendant's president, and after certain preliminary negotiations an agreement was reached between the plaintiff and defendant which was the basis of the plaintiff's cause of action stated in Count 5 of the complaint. Even before this agreement was reached, however, Snider had taken steps to advertise to the trade these proposed plastic shades and to hire additional employees in connection with a selling campaign.

The agreement referred to in Count 5 was evidenced by a writing by the defendant dated March 15, 1948, and by plaintiff's reply thereto dated the next day. Defendant's letter of March 15, 1948, was as follows:

"Egyptian Chemical Company,
"173 Milk Street, Boston 9, Mass.
    "Attention Mr. Herman A. Snider
"Gentlemen:

"Agreeable with your recent request to submit a proposal for our furnishing 5,000 molded lamp shades out of nylon material—we are pleased to advise as follows:

"Mold and fixture cost  *  *  * $6,000 with completion in approximately 10 weeks.

"5,000 lamp shades to be molded in one production run out of nylon with average wall thickness of not more than .093 with shade dimensions to be approximately 16 inches diameter by approximately 7 inches high.

"It being understood that in order to meet the heat requirements of Nylon Material it will be necessary that some sort of heat deflecting material be used around the surface of where the metal lamp contacts the shade.

"In this connection we propose to furnish and assemble to each lamp shade a bright aluminum cone shaped reflector to fit against walls of this area and having special thermoplastic adhesive which securely binds it to the lamp shade itself.

"In addition to this reflector we understand you desire that we vent the neck area of the shade to permit air circulation. We believe this is desirable and should prove helpful in keeping the heat down to a minimum over this area.

"We further propose to remove all sharp burs from molded shades and wrap each shade in white tissue and pack two shades to a specially made corrugated container which we will submit at a later date for your approval.

"For molded lamp shades in accordance with the above specifications and in neutral shade of nylon we quote price of $5.60 per shade.

"For same shades molded of tinted colors of nylon we quote price of $5.90 per shade.

"The above quotations are subject to the following terms and are f. o. b. this plant.

"Molds: Net cash with order.

"Molded shades: You agree to pay us one-half of the total dollar amount of this order within six weeks after placing your order for mold. This amount to be credited to your account. Shipments made to you will be deducted from this balance on terms of 1 per cent f. o. b. this plant.

"When shipments are made to the extent of where a balance of $5,000 is left in your account and at that time you agree to establish with us satisfactory credit relations for continuing further shipments, on open account basis.

"In the event such satisfactory credit relations are not established at that time we reserve the right to stop production and shipments until such time as you establish relations to permit further production and shipments.

"Samples: We agree to furnish samples molded from completed mold for your approval before going into production and you agree to promptly approve these samples unless samples are found defective through poor workmanship in which case we are to submit further samples.

"Molds and fixture equipment: The making of molds, dies, tools and fixture equipment are undertaken by us at no profit and it is understood while this equipment is for your exclusive use it cannot be removed from our plant.

"Due to the nature of this job, we fully expect to submit samples promptly after completion of mold. There is however some possibility of our running into unforeseen difficulty and in that event we would endeavor to overcome our difficulty in as short a space of time as possible.

"We believe this covers all matters and assure you we will endeavor to produce a very satisfactory nylon lamp shade for you.

"We now await your kind commands to proceed.

"Very truly yours,
"General Products Company, Inc.
"(Signed) C. A. McBride"

Plaintiff's letter in reply, dated March 16, 1948, was as follows:

"Gentlemen:

"Enclosed you will find our check in the sum of $6,000 as per your proposal dated March 15, 1948, for the mold costs for the manufacturing of a mold for the nylon lamp shade mentioned therein. The other terms in your letter are acceptable to us and are hereby accepted.

*"We are enclosing a rough sketch suggesting to you the proposed venting which our engineer thinks might be of assistance to you in the venting of the shade. He also suggests to you that the inside of the nylon shade be fluted so that the cone you propose to set against the walls of the interior thereof will have air vents running up to the edge of the cone.* [Italics added.]

"Naturally, we hope that work on this item can be expedited so that we may receive the shades in the shortest possible period of time.

"Very truly yours,
"Egyptian Chemical Company."
"Herman A. Snider

Not only did Snider give defendant that check for $6,000 covering the cost of making the mold, as per the agreement, but in addition, on May 3, 1948, he gave defendant a check for $14,000, representing advance payment of one half the dollar amount of 5,000 nylon shades of neutral color at $5.60 per shade—also in compliance with the agreement.

On June 8, 1948, Snider applied for a patent on a plastic lamp shade with a circulating air passage. In his patent application Snider explained that, to avoid deterioration of the plastic material by the application of heat, a metal floor or coil was provided to deflect the heat.

On June 15, 1948, defendant submitted samples to Snider in accordance with the agreement. These samples had metallic foils adhesively attached to the inner part of the shade, as in the design in Snider's original patent application. It is clear that Snider never approved these samples. He was much disappointed that tests of the samples disclosed evidence of discoloration from heat. Some more effective means of deflecting the heat from the nylon was needed. It then occurred to Snider to

use a detached reflector affixed to the shade by bosses, and the design for such detached reflector was incorporated by amendment in his original patent application. Certain changes in the mold were thereby made necessary, and Snider authorized the defendant to make such changes. Even before the receipt of the foregoing samples, plaintiff had put out to the trade an advertising brochure asserting that the forthcoming shade is "an Egyptian Exclusive, developed in Egyptian's own research laboratories, under the direction of Mr. Jack O. Beaty."

However, by November 1, 1948, plaintiff had abandoned the project of producing and selling a nylon shade, for the use of nylon was concluded to be "out of the question." Discussion was had with defendant on the substitution of cellulose acetate. The use of this different plastic material, plus the decision to place a detached reflector on the shade by use of molded bosses, necessitated the return of the mold to the manufacturer for structural changes, which changes were made some time before December, 1948.

But on December 4, 1948, which was after Snider had abandoned as impracticable the project for nylon shades, Snider demanded of defendant the return of the check for $6,000 for the mold and the check for $14,000 given as advance payment on the nylon shades. Defendant complied, and returned both these checks to the plaintiff.

During January, 1949, defendant manufactured and delivered to the plaintiff 822 shades made of cellulose acetate. Inspection was made by plaintiff's foreman, and these shades were promptly sent on to plaintiff's customers who had ordered nylon shades. Most of the 822 shades were returned to Snider with the complaint of breakage around the neck. Snider made no claim that this breakage was due to any breach of contract by defendant, but brought suit against the transporting carrier charging negligence by the carrier as the cause of the breakage.

Though no agreement had been reached between the parties as to the price or terms of payment for the acetate shades, defendant later billed the plaintiff for the 822 shades at $5.00 per shade, or a total of $4,110. As of April 12, 1949, plaintiff's indebtedness to the defendant stood in the sum of $11,-487.38, composed of this item of $4,110, plus $6,000 as the cost of the mold, plus an additional amount of $1,166.69 covering authorized structural changes in the mold, plus two or three minor items. On that day plaintiff paid defendant $5,000, reducing this indebtedness to $6,487.38. After a conference on May 10, 1949, Snider gave defendant a promissory note for $5,487.38 (the amount of the indebtedness less an agreed credit of $1,000). This note was payable in installments, with an acceleration clause.

Shortly thereafter, plaintiff ordered 1,000 acetate shades at $4.00 per shade. On May 17, 1949, defendant accepted this order from the plaintiff "for molded Plastic Lampshades to be molded from Celanese Acetate XF H5 which you have approved" and stated that the acceptance was on the basis of agreed terms, as follows: "Prior to shipment being made you are to come here with signed trade acceptances executed by authorized officers of Egyptian Chemical Company and payable in thirty (30) days." Pursuant thereto, plaintiff on May 20, 1949, submitted its trade acceptance in the sum of $4,000, due June 19, 1949. The 1,000 shades were promptly manufactured and delivered to plaintiff. Snider tested some of them and claims to have found that they had an odor and discoloration from the heat. Nevertheless he dispatched the shades to plaintiff's customers. Some of such shades were returned by the customers showing a charred condition around the neck. But plaintiff paid its trade acceptance of May 20, 1949, when due,

without complaint or protest to defendant.

On June 23, 1949, Snider ordered another batch of 1,000 acetate shades, and on July 25, 1949, executed a trade acceptance therefor in the amount of $4,000, maturing one month later. Defendant manufactured and delivered the 1,000 shades during July, but at the date of maturity plaintiff defaulted in payment of the trade acceptance. At this time plaintiff had also defaulted on the second installment on its promissory note of May 10, 1949, leaving a balance due thereon of $4,487.38. These two defaults were the basis of defendant's counterclaims in this case, on which defendant has obtained a verdict and judgment for the full amount claimed.

■ It is manifest that the agreement between the parties evidenced by the letters of March 15 and March 16, 1948, above set forth, contained no express warranties by the defendant. Also, from the circumstances above related, it is manifest that we could not, as a matter of law, imply on the defendant's part a warranty of merchantability of the nylon shades or a warranty of fitness for the expected use by the buyer.

■ So, too, we think it is clear that the respective obligations of the parties to the agreement of March 16, 1948, were rescinded by mutual consent when Snider made known to the defendant his conclusion that the use of nylon was impracticable and on behalf of his company demanded and received back the advance payments which the plaintiff had made on account of the executory contract. The facts will not sustain an interpretation that the original agreement was merely modified by the substitution of 5,000 shades of cellulose acetate for 5,000 shades of nylon plastic, leaving the other terms of the agreement intact. This is because at the time the parties agreed to try out cellulose acetate they came to no understanding as to the price of the acetate shades, which everyone assumed would be somewhat cheaper; and for lack of definiteness in this respect there could be no enforceable obligation on the defendant's part to manufacture 5,000 acetate shades. At the conference of May 10, 1949, agreement was reached for the manufacture of 1,000 acetate shades in consideration of a trade acceptance in the sum of $4,000. In June of 1949 another order for 1,000 acetate shades was given on the same terms. In other words, after the rescission of the original agreement for nylon shades, the parties evidently proceeded on an order-by-order basis.

Moreover the plaintiff, having accepted the shipment of 822 acetate shades and the two subsequent shipments of 1,000 acetate shades each, without making reasonably prompt complaint to the defendant of any defects claimed to constitute a breach on the defendant's part, cannot now complain of any breach by the defendant with respect to the 2,822 shades.

■ And even if by modification of the original contract the defendant had assumed an obligation to manufacture and deliver a total of 5,000 acetate shades, the plaintiff would be in no position to enforce a claim for the nondelivery of the remaining 2,178 acetate shades because of the plaintiff's own material breaches of contract, as established, indeed, by the verdict and judgment for defendant on its counterclaims.

The judgment of the District Court is affirmed.