**SKOPES RUBBER CORP., Plaintiff, Appellant,**

v.

**UNITED STATES RUBBER COMPANY, Defendant, Appellee.**

**No. 5860.**

United States Court of Appeals
First Circuit.

Feb. 27, 1962.

Jerome Medalie, Boston, Mass., with whom Irving Fishman and Cohn, Riemer & Pollack, Boston, Mass., were on brief, for appellant.

Blair L. Perry, Boston, Mass., with whom Edmund Burke, Boston, Mass., Myron Kalish, New York City, Hale & Dorr, Boston, Mass., and Arthur, Dry, & Dole, New York City, were on brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the District of Massachusetts granting the defendant-appellee's motion for a directed verdict on two counts [1] of plaintiff-appellant's complaint which alleged a breach of contract and a breach of warranty by sample arising out of the sale of certain material which was to be used in the making of skin-diving suits.

It is the plaintiff's theory that, out of a series of correspondence and personal conferences, there arose an agreement with the defendant under which the latter agreed to furnish certain material to the plaintiff to be utilized in the production of skin-diving suits. This material, according to plaintiff, was to contain specific and definite qualities and was to conform to a specific sample which had been previously furnished to the

---

[1] This action originally involved two plaintiffs, the Skopes Rubber Corp. (appellant here) and the Sko-Bar Rubber Corp., Massachusetts corporation. The amended complaint filed in the district court contained eight counts, four on behalf of each plaintiff. Since all counts except Skopes' Count I (breach of contract) and Count IV (breach of warranty) were withdrawn with prejudice at the conclusion of the trial, our discussion will be limited to Counts I and IV. The defendant's counterclaim was ordered dismissed by the court. The parties will be referred to as plaintiff and defendant as in the district court.

plaintiff during the course of the negotiations and which, again under plaintiff's view, had been made a part of the contract. Defendant denies that it entered into any binding contract with plaintiff. Alternately it argues that any agreement into which it might have entered merely looked towards the development of a new product whose successful production was so speculative that the failure to achieve the hoped for result could not give rise to legal liability. Further, it argues that even assuming the existence of an agreement, there was no evidence of a warranty that goods furnished incident thereto should conform to a specific sample. Finally, it contends that any agreement which may have existed was rescinded by mutual consent.

The facts in this case are largely undisputed. It appears that in 1958 the only "wet"[2] suit material on the market was a product made of black neoprene sponge rubber. Dissatisfied with this material because the black color made underwater visibility unsatisfactory, three devotees of the skin-diving sport considered the prospects of obtaining an alternative material. These individuals, later to become associated in the plaintiff corporation which was organized on August 28, 1958, were Melvin Bardin, Tom Skope and Fred Elashoff.

On May 30, 1958 Bardin wrote to the defendant, inquiring as to whether it had available any white material containing certain enumerated properties which might be used for skin-diving purposes. A reply dated June 16, 1958 introduced Bardin to U. S. Rubber Company's Ensolite.

Ensolite, which had been sold commercially by the defendant since 1949, was a lightweight, closed cell material somewhat similar to foam rubber in appearance and texture. It had been used for athletic padding, wrestling mats, boat seats, life jackets and aviation applications. In its reply to Bardin's initial inquiry, defendant stated that Ensolite possessed " * * * excellent shock absorbent, sound deadening, thermal insulating and flotation properties." Defendant enclosed a sample of Type M Ensolite and noted that the material " * * * might prove satisfactory for your intended use." Other correspondence was exchanged. On June 20 defendant wrote to Bardin with further information concerning Ensolite, enclosing a price list and specifications sheet. Thereafter, defendant supplied Bardin with thirty-five square feet of Type M Ensolite and stated that "We would appreciate very much hearing from you on the results obtained from using Ensolite in a skin diving suit."

After making up and testing a trial suit, on July 21, 1958, Bardin wrote to the defendant that "although there is no definite result yet, * * * with some minor changes I think we will have something." After noting that more tests would follow, Bardin stated: "One thing is certain. The skin on the Ensolite is too easy to rip. We believe that it is because it is not smooth. It catches very easily on equipment, shells, rock and barnacles. Most certainly it would rip on coral. The skin you used had a grain effect. I am enclosing another strip of neoprene so you can see what I mean by a smooth surface." The letter then concluded: "Please let me know whether you can match the smooth skin."

In reply, on July 25, 1958, the defendant wrote as follows: "U. S. Ensolite can be vinyl coated to provide better abrasive wear and give additional tensile strength. We are enclosing a 1" thick sample of Type M Ensolite which has been vinyl coated with the color Red. * * * As you can see by this sample, the vinyl coating has dissipated the grain

---

**2.** There are two types of skin-diving suits. A "dry" suit is made of rubber and is designed to keep the body completely dry. A "wet" suit is made of a sponge material which allows a film of water to enter and remain between the suit and the skin of the wearer; the film of water is heated by body temperature. The suits involved in this case are of the "wet" type.

effect of the Ensolite, and has given it a smooth effect." This reply also noted that vinyl is not applied at the factory but is sold to the customer for his own application.

After the letter of July 25, the defendant sent Bardin a sheet of green Ensolite. Although this sheet had apparently not been coated with the vinyl (viz., sample enclosed in above letter of July 25), a suit was made from this and tested. At the trial Bardin testified that this suit though warm, buoyant, stretchable and highly visible under water, " * * * still had the same type of skinning that we had in the original thin suit. Actually, we didn't think it was hard enough on the outside for our purposes for abrasion resistance. Everything else in the suit was fine."

On August 19, 1958 Bardin, Skope and Elashoff met in Philadelphia with Joseph Pert, sales manager of the defendant's Ensolite Products Division, and Ronald Tuohey, a sales representative of the United States Rubber Company. A skin-diving suit which was recently made from the green uncoated Ensolite was displayed to Pert and Tuohey and the quality of Ensolite as applied to skin diving was discussed. Bardin then testified:

"At this particular time, I pointed out to Mr. Pert and Mr. Tuohey the outer skin on it, * * * and asked them if there was something they could do to make it more abrasive-resistant. * * *

"Q. Did they say they could do anything with that suit to make it more abrasive-resistant? A. Yes, they did.

"Q. Who was it that said so? A. Mr. Pert * * * told me that they could put on a vinyl, a liquid vinyl coating on the material, which would give it substantially more strength, make it more resistant to abrasion and give it a better tensile strength, and just in general improve that particular thing that we were questioning."

Bardin also testified: "At the conference Mr. Pert told us that they had plenty of experience vinyl-coating ensolite such as wrestling mats, et cetera, which take a terrific amount of punishment, and that he would recommend that we take a sheet of material with vinyl covering on it, make a suit out of it and try it out."

Bardin then informed Pert and Tuohey of their plans for world-wide distribution of the material if it could be satisfactorily produced. Testifying as to this conference at the trial, Pert confirmed the fact that Bardin had complained to him that the surface of the Ensolite was too tender and that something should be done to improve abrasion resistance. Pert told Bardin of the success which various sporting goods manufacturers had achieved in increasing the abrasion resistance of Ensolite by coating it with liquid vinyl. He stated that while the company had not previously coated Ensolite on a production basis for its customers, " * * * I further told him, or suggested, that we would be most happy to coat some sheets by hand, and submit them to them for further testing."

Following this conference, on August 28, 1958, defendant forwarded to Bardin and his associates nine sheets of white Ensolite which had been coated with vinyl. This material, like the sample furnished on July 25, was smooth-surfaced. Nine suits were immediately made from this material and became the subject of extensive testing.

With one modification (to be later discussed) this material proved to be eminently satisfactory for skin-diving purposes. Indicative of the favorable qualities of these suits was the following testimony of Elashoff at the trial:

"Q. Can you tell the Court and jury what characteristics with reference to the skin-diving itself you observed in this suit as a result of your first swim with it? A. Well, it was light, I mean light in weight, easy to put on, it stretched; it give (sic) a diver an extreme amount of

confidence because it was so buoyant; the safety factor was mentally very satisfactory.

"There was ease of swimming. Arms and legs were free. The suit was simple to take off, you didn't have to use any powder to put it on."

Bardin testified that he swam the suit at least fifty times during the entire fall and winter of 1958–1959 in water ranging from 50° F down to 28° F. A suit made from this material was tested by James Cahill, a professional diver who testified that he "was very much impressed by it." Cahill thereafter communicated with the Finjohn Company of Philadelphia, which company he represented, and arranged for Bardin and his associates to confer with Finjohn on the possibility of marketing the material. The evidence further disclosed that in November 1958 a certain Francois Vilarem, president of U. S. Divers Co., one of the country's leading distributors of skin-diving equipment, tested a suit made out of the sample white material and thereafter personally confirmed an order by his company of 5,000 sheets of Ensolite from the plaintiff.

On September 12, 1958 Bardin wrote to Pert that the material previously sent "is proving to be very good. We have decided to go ahead with this combination unless we and you come up with something better. This material is truly buoyant, real warm at all depths, and resists real punishment."

During the week of September 20, 1958 Bardin, Elashoff and Skope held a conference with Pert in Newton, Massachusetts. Bardin testified as follows:

"Q. Tell us the conversation that took place. A. We went over the topics that we had discussed in Philadelphia * * * and * * * the vinyling of the suit and—

"Q. The what? A. The vinyl-coating of the suit, and told Mr. Pert that it was doing a real good job, we were satisfied with it.

"However, we did point out to him that the vinyl was not applied evenly on all the sheets. * * *

"Mr. Pert told us at that time that it would be a very simple thing to increase the thickness of the vinyl coating that was on this material, and that also this wouldn't happen in doing it by machine, that it would be done evenly and smoothly, as against doing it by hand; and that by increasing the thickness of the vinyl film we would accomplish two things, we wouldn't have any open spaces here * * * and secondly, it would give the ensolite a tougher coat by doubling the skin on it, which would make it more resistant to abrasion."

Bardin testified that Pert called defendant's plant in Mishawaka, Indiana, and spoke with a Donald Zimmerman, chief chemist of the defendant's Ensolite Products Division, as to whether it would be practicable to increase the thickness of the vinyl coating. After this call "Pert informed us that Mr. Zimmerman had told him that * * * it was a very simple matter to thicken up the surface, the vinyl coating, that it might take another pass or two through the machinery to do it, but it was no problem at all." At Zimmerman's request, Pert took a small sample of this material back to Mishawaka for examination and measurement by Zimmerman.

Pert, testifying as to the Newton conference, verified that the plaintiff's representative had asked him whether the company could coat the Ensolite mechanically with liquid vinyl. Pert testified that while defendant had never done any previous mechanical coating of Ensolite "basing this on a previous experience I had with the Company when I was sales manager for the coated fabric department—I told them that the coated fabrics department had lots of experience in coating cloth and paper. * * * And I told them that it might be possible for us to utilize the coated fabric facilities for coating ensolite." He also con-

firmed the fact of the phone call to Zimmerman and that the latter wanted a sample so that he might establish a cost basis for the prospective coating.

The day following this conference Pert personally observed Bardin and Skope swim the smooth-skinned white Ensolite skin-diving suits.

On October 8 Bardin and Skope conferred with Pert, Zimmerman and other officials of the defendant at the Ensolite plant in Mishawaka, Indiana. Bardin had with him two of the white smooth-skinned suits which had been made out of the materials supplied to plaintiff on August 28. It was these suits which apparently served as the basis of discussion at the conference because in Bardin's words, these suits were "spread out over Mr. Pert's office * * * and Mr. Pert showed them at various times to various people that came into the room." Bardin testified Zimmerman reported that his examination of the sample brought to him by Pert from the Newton conference showed the thickness of the vinyl coating to be approximately 1.2 mils. Pert then asked him if the company could make it 4 mils and Zimmerman replied that this could be done. A delivery date of between November 15 and December 5, 1958 was given by the production manager. There were discussions of an exclusive dealership. Pert asked for a definite order as a prerequisite to defendant producing anything or granting an exclusive distributorship. Plaintiff placed an order of approximately $21,250. On November 25, 1958 another order was placed with defendant. Pert was told that Bardin was going directly from Mishawaka to California to contact three large distributors of skin-diving material on the prospect of marketing the Ensolite suit. Bardin then went to California and secured substantial orders from two large distributors.

Pert also testified as to the October 8 conference in Mishawaka. Although he stated that he advised the plaintiff's representative that the defendant had not yet arrived at a satisfactory method of coating the Ensolite material, he did insist that he wanted a purchase order which would justify his company going into production. Pert confirmed that a conference with Zimmerman took place at which they set the standard of approximately 4 mils for the vinyl coating. Pert quoted a price of 26¢ per square foot for the coated Ensolite. He also confirmed the exclusive distributorship arrangement.

Other testimony concerning the October 8 conference was supplied by Zimmerman. He acknowledged that in September 1958 he had received a phone call from Pert in Newton inquiring as to whether the company could factory-coat Ensolite material with vinyl and that he replied he felt that the company could do it. He asked Pert to bring a sample. Thereafter he received a sample of the hand-coated, white smooth-surfaced Ensolite which had been made into suits from the shipment of August 28. Zimmerman testified that in preparation for the October 8 meeting "I requested the laboratory chemist to investigate the equipment and techniques needed to produce a sheet production material * * *.

"And after he investigated those two phases of the assignment, he then went to the engineering department and the cost department, and the three of them came up with an estimated cost of producing vinyl-coated ensolite.

"Q. Now that was all done in preparation for this conference you knew was coming on October 8th; is that not substantially correct? A. Yes."

Zimmerman transmitted the cost figures derived from these investigations to Pert on October 7—the day before the conference. Zimmerman then acknowledged that at the October 8 conference he was asked whether or not the coating on the Ensolite could be approximately doubled to 4 mils, and he testified "I felt we could do that."

Following the October 8 conference, Bardin received a letter from Pert which

confirmed the agreement reached between the parties in Mishawaka. This letter read in part as follows:

"This will confirm our understanding of some of the things that were mutually agreed concerning your use of ENSOLITE for underwater apparel. For the period of October 1, 1958 through September 30, 1959, we will produce for you ENSOLITE in thicknesses of ⅛″ and ³⁄₁₆″ with vinyl coatings that match the compound. Specifically, the present colors assigned to you are white, green, red and blue. This agreement will cover all underwater apparel.

"It is our understanding that the above mentioned ENSOLITE will be both for skin diving kits and in the manufacture of various underwater apparel. We also understand that you will function as a distributor for these items. The suggested resale price for ³⁄₁₆″ Type M with no skin and coated on one side in a color matching the compound, will be 36c per square foot in quantities up to $999. In quantities from $1000 to $9999, the price will be 30¢ per square foot.

"The above mentioned items are being assigned to you as a distributor, and we will make every effort to sell these items through you as a distributor whenever we are approached on a direct basis. * * *."

During Bardin's trip to California the plaintiff commenced an extensive advertising campaign. A photograph and an article on the suits appeared on the front page of a nationally distributed newspaper Sunday supplement. United States Rubber participated fully in this advertising campaign, referring to the " * * * new, all new * * * skin-diving suit made of specially developed U. S. Ensolite closed cell vinyl."

On November 3, 1958 Pert wrote to Bardin that the defendant had encountered difficulties in its first factory trial of mechanical coating but that he believed that the situation would be corrected shortly. On December 2, Pert met with representatives of the plaintiff and showed it the samples of material from the first production run. The record indicates that the material coated mechanically was drastically different in appearance from that which had been hand-coated. Whereas the hand-coated material had a smooth-skinned surface the machine-coated Ensolite was completely covered with wrinkles.[3] Both parties readily recognized the total dissimilarity in appearance between the material which had been the basis of negotiations and that which was subsequently produced.

Bardin, upon seeing the wrinkled material, expressed his desire to withdraw from further dealings with defendant and terminate the relationship. There was ample evidence in the record to indicate that he agreed to accept the "wrinkled" material only upon Pert's assurance that the wrinkles apart, this material was exactly the same as the previously furnished smooth-skinned material. On these assurances plaintiff accepted the "wrinkled" material and proceeded to fulfill the orders which it had received.

Shortly thereafter the plaintiff received reports from persons to whom the suits had been shipped stating that the suits were breaking up in use. Upon receiving these reports Bardin made up a suit for himself from a sheet of the production-run material. After three-quarters of an hour in the water the suit had broken at all stress points. The suits which were returned to the plaintiff had broken in the same places. These failures in the material were promptly

---

3. It appears that under the mechanical application as the Ensolite passed through the coater and drier, it was subjected to considerable stretching. Once the process was done, the material would contract to its original size—causing the wrinkles.

communicated to Pert. This litigation followed.[4]

We believe that the district court erred in directing a verdict for the defendant. Considered from the aspect of the alleged breach of contract, we believe that there was evidence from which a jury might properly have found an agreement under which defendant was to deliver to the plaintiff a smooth-coated, vinyl-surfaced Ensolite containing certain properties of elasticity and stretch. (Those properties contained in the Ensolite previously furnished and tested). Both Bardin and Pert gave testimony from which a jury might properly have concluded that such an agreement—crystalizing the prior conferences and correspondence—had been reached at the Mishawaka meeting on October 8, 1958 and confirmed in some particulars by a letter from Pert to Bardin on the following day. There was evidence that the material which was to form the subject matter of the contract was the smooth-surfaced coated Ensolite which was the material approved by the plaintiff and brought by Bardin to the October 8th conference in Mishawaka. The price of this material was agreed upon and a substantial order was placed by the plaintiff upon the defendant's insistence. Thereafter there was ample evidence from which it could be found that defendant neither produced smooth-coated material nor material which possessed qualities of stretchability consistent with those of the materials agreed upon. While the plaintiff may have initially accepted the wrinkled Ensolite, this acceptance was conditioned upon the assurance that this material was virtually identical to that previously furnished.

Subsequent events soon showed that such was not the case.

Similarly if viewed from the aspect of a breach of warranty by sample, there was evidence from which it might have been found that a specific sample had been incorporated into the agreement and that the material ultimately furnished failed to conform with this sample. Such evidence would include Bardin's statement in his September 12, 1958 letter to the defendant which referred to the smooth, vinyl-coated material, as the material which the plaintiff had decided "to go ahead with;" the conferences with Pert, both in Newton and at the defendant's plant in Mishawaka, at which the basis of discussion was the smooth-surfaced Ensolite; and the fact that it was a sample of the smooth-surfaced Ensolite which was sent by Pert to Zimmerman for measurements of the vinyl surface and for an analysis of the prospective cost picture. All of the foregoing might properly have led a jury to conclude that the white, smooth-surfaced vinyl-coated sample was made the basis of the October 8 agreement and also the basis of the exclusive distributorship. That the material supplied was markedly deficient from this smooth-surfaced material was the subject of abundant testimony at the trial.

Relying on our decision in Egyptian Chemical Co. v. General Products Company, 1 Cir., 229 F.2d 263 (1956), defendant argues that any agreement which it could be found to have entered was experimental and development only; the type of an agreement where "if the hope exceeds the result," the courts will not impose contractual liability.

4. After it became apparent that the machine-coated material did not fulfill plaintiff's requirements, defendant suggested that a "laminated" material might prove more suitable. Subsequently on February 27, 1959 some laminated material was produced and sent to plaintiff who in turn shipped some of it to U. S. Divers Corp. This too proved unsatisfactory. Defendant contends that by these actions the parties entered into a modification of their original agreement as a matter of law. We do not believe that the plaintiff intended to surrender or modify any of its contract rights under its original agreement by these acts. To the contrary, at the trial both Pert and Zimmerman testified that Tom Skope, when approached on the subject of the laminated material, declared that plaintiff would consider it solely in connection with the following year's sales program.

We do not believe that Egyptian Chemical governs the facts here. In that case, as we there noted, a plaintiff who entered into an agreement with the defendant for the manufacture of hitherto untried plastic lamp shades "was well aware of the problem[s]" involved in the prospective manufacturing process. The written agreement into which the parties entered expressly noted that before the defendant went into actual production it would submit samples to the plaintiff for its approval. The agreement further contained the following cautionary language: "Due to the nature of this job we fully expect to submit samples promptly after completion of mold. *There is however some possibility of our running into unforeseen difficulty* and in that event we would *endeavor* to overcome our difficulty in as short a space of time as possible." Id. at 266. (Emphasis supplied.)

No satisfactory samples of the kind of shades envisioned by the agreement in that case were ever submitted to the plaintiff. Shortly thereafter the project of producing such shades was abandoned by the plaintiff as "impracticable" and this conclusion was communicated to the defendant. Plaintiff sought and defendant returned all advance payments made under the original agreement. Thereafter, though there occurred further dealings between the parties, the evidence showed that the parties "proceeded on an order-by-order basis." Subsequently, plaintiff brought an action alleging a breach of contract or warranty predicated on the original agreement. In affirming a judgment for the defendant notwithstanding a verdict, we noted that on the facts there present we could find no express warranty by the defendant nor could we find an implied warranty of merchantability or fitness. Moreover we found that the original agreement was rescinded by mutual consent at the time that the plaintiff told the defendant that it had concluded the subject material to be impracticable and demanded and received back its advance payments.

The instant case is unlike Egyptian Chemical. There no satisfactory end product existed at the time that the agreement relied upon to establish liability was executed. There the agreement specifically called for the creation of a satisfactory sample prior to mass production and expressly alluded to the "possibility of * * * unforeseen difficulties" which defendant would "endeavor" to overcome. Here at the time of the October 8 conference there existed a product, produced from samples furnished to plaintiff by the defendant which had been thoroughly tested and which had apparently proven eminently satisfactory to the plaintiff. From the plaintiff's viewpoint, no further research or development was contemplated. So long as the material subsequently produced would conform to the material which plaintiff had been previously supplied, the plaintiff presumably would have been satisfied. To be sure the material previously supplied had been hand-coated, but we cannot say that the record indicates that the plaintiff anticipated, nor did the defendant give it reason to anticipate, that there would be any "unforeseen difficulties" in applying the vinyl by machine as opposed to a manual operation. In sum, we do not believe that this is so much an instance of the hope exceeding the result as it is the result-produced deviating from the result-promised. At least there was evidence from which a jury could so conclude.

■ A further argument of defendant warrants comment. As noted previously the material which the plaintiff had tested, which had proven largely satisfactory and which apparently was the basis of the discussion at the October 8 conference, was smooth-skinned Ensolite. The material subsequently furnished which proved to be totally unsatisfactory was a wrinkled material. In its brief defendant stated "apparently the plaintiff contends that the wrinkles *did* affect the stretchability of the material, but there was no evidence which would warrant the conclusion that the wrinkles rather than the heavier vinyl

coating, caused any lack of stretchability or other undesirable result." This reasoning permeates defendant's brief and is, in our judgment, a basic fallacy in its position. In effect, it attempts to shift a burden which is properly upon it and not on the plaintiff. Once the plaintiff produced evidence showing that the smooth-skinned surface had proven satisfactory whereas the wrinkled material had not, we believe that it bore no burden to show that the undesirable result was produced by the wrinkles rather than some other cause. If the wrinkles did not produce the adverse effect, it was up to the defendant and not the plaintiff to demonstrate the fact.[5] Indeed the district judge apparently recognized this fallacy. At a bench conference in questioning plaintiff's counsel on the necessity of proceeding with expert testimony on the cause of the tearing of the wrinkled material, the following colloquy took place:

"The Court: Who cares about the explanation? They did break or they didn't break.

"Mr. Medalie: I agree with you, I just feel this buttons it up real tight.

"The Court: It may be necessary after the defense do something or other, to prove, but it doesn't seem to me—you said they promised by contract or warranty to furnish a suitable material, and you have shown that they started off with material that worked when they processed it by hand; you have offered evidence to show that when it was machine processed it didn't work; you have shown the dealings between the parties.

\*  \*  \*  \*  \*  \*

"The Court: I don't want to foreclose you, but it seems to me at this moment it doesn't make much difference. \*  \*  \* "

■ Finally defendant argues that the evidence discloses that the Skopes Corporation elected to rescind any contract which it may have had with defendant and that consequently, having made such an election of remedies, plaintiff is effectively barred from bringing the instant action. It predicates this argument on two grounds, neither of which are persuasive to us on the present record.

First, defendant urges that the fact that a certain portion of the goods shipped by it to Skopes and subsequently found unsatisfactory was returned to defendant and credited to Skopes' account is indicative of a rescission and precludes the plaintiff from seeking damages. Defendant contends that under the relevant law of Indiana[6] (which law apparently governs the instant case), a party who desires to seek damages for a breach of contract cannot return to the seller any property which he may have received under that contract. Under defendant's view if a plaintiff returns the goods (even in the presumably laudable attempt to minimize damages) his right of action for damages stemming from the breach is gone.

Defendant has cited us no Indiana case in support of such an interpretation

---

5. Defendant contends that increasing the vinyl coating from 1.6 mils to 4 mils may itself have produced the undesirable results. It produced no evidence to that effect. Moreover the record indicates that the suggestion that the vinyl be increased to achieve a more "even" finish came from Pert and that Zimmerman indicated that such an increase would simply require the material being rerun through the machinery. At all events, Zimmerman testified at the trial that the wrinkling of the material occurred in the very first of four applications of vinyl.

6. Indiana Statutes, Title 581 (Sales), Section 58–507, of which the court below took judicial notice, provides: "Where there is a breach of warranty by the seller, the buyer may, at his election \*  \*  \* rescind the contract to sell or the sale and refuse to receive the goods, or if the goods have already been received, return them or offer to return them to the seller and recover the price or any part thereof which has been paid."

nor has our own research uncovered any. To the contrary, our reading of the pertinent statute convinces us that the question of whether or not there was a rescission is a separate question from that concerning the return of particular property and this latter act is not *ipso facto* dispositive of the question of rescission.

■ It is well settled that rescission is essentially a matter of mutual intention—a factual question to be gleaned from the expressions and conduct of both parties to an agreement. See Corbin, Contracts § 1236 (One Volume Ed.). The mere fact that there is a return of some of the subject matter involved in the agreement is not determinative that a rescission has taken place. Bagwell v. Susman, 165 F.2d 412 (6 Cir.1947). It is merely a factor to be considered together with all relevant factors in attempting to assess the true intent of the parties.

■■ Next, defendant argues that at the trial the plaintiff through its president—Bardin—admitted that it was its intention to rescind the agreement with defendant. The sole basis for this assertion stemmed from the following cross-examination of Bardin by counsel for defendant:

"XQ. And as a result of Mr. Vilarem having tested one suit and notifying you that it had broken, you thereafter rescinded all orders with the United States Rubber Company didn't you? A. As a result of his rescinding mine, I did."

It is obvious to us that whether inadvertently or not the word "rescinded" was put into the witness' mouth. As every lawyer knows the term rescind is a legal concept having peculiar and powerful ramifications whose existence and character would scarcely be known to the average lay witness—as was Bardin.[7] Consequently we are entirely unwilling to attribute the probative force to this statement for which defendant contends. Moreover, our view of the entire record convinces us that at the very least the question of whether there was a rescission in the instant case was a question for the jury.[8]

A judgment will be entered vacating the judgment of the district court insofar as it dismissed Counts I and IV of the complaint and remanding the case to the district court for further proceedings not inconsistent with this opinion.

7. This type of situation was undoubtedly contemplated by the drafters of the Uniform Commercial Code. In Section 2–720—dealing with the effect of cancellation or rescission on actions for an antecedent breach it is stated: "Unless the contrary intention clearly appears, expressions of 'cancellation' or 'rescission' of the contract or the like shall not be construed as a renunciation or discharge of any claim in damages for an antecedent breach."

The comment explaining this section states: "This section is designed to safeguard a person holding a right of action from any unintentional loss of rights by the ill-advised use of such terms as 'cancellation', 'rescission', or the like. * * * "

8. The complaint in this case was filed on June 8, 1959. Defendant filed an answer on July 22, 1959 and took depositions of the plaintiff's principal officers in September, 1959. Neither in its answer nor at any time prior to the commencement of the trial did defendant indicate that it intended to rely on the affirmative defense of rescission or urge an election of remedies. Apparently the first indication that counsel for the plaintiff had that the defense would be raised was when the defendant argued its motion for a directed verdict after the plaintiff had already closed its case. Indeed, the very last act of defendant's counsel at the trial was to file an amendment to his answer, which added the affirmative defense of election of remedies. The final act of the trial court after directing a verdict for the defendant was to allow this amendment. While we recognize that the Rules of Civil Procedure contemplate liberality so far as amendments to pleadings are concerned, this liberality must be tempered by a consideration of the possible prejudice to an opposing party from an abrupt change of theory. We believe that the possibility of such prejudice was present here.